**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
(Western Division)

| | | |
|---|---|---|
| PAMELA STEWARD, | : | Civil Action No. 3:18-cv-2905 |
| 859 Miami Street, Apt. 11 | | |
| Tiffin, Ohio  44882 | : | |
| | | |
| RALPH MAGERS, | : | |
| P.O. Box 426 | | |
| Tiffin, Ohio  44883 | : | Judge: |
| | | |
| and | : | |
| | | |
| MARK FELTON | : | Magistrate Judge: |
| 180 Gross Street | | |
| Tiffin, Ohio  44883 | : | |
| | | |
| Plaintiffs, | : | |
| | | |
| v. | : | Jury Trial Demanded |
| | | |
| ROPPE CORPORATION, | : | |
| 1602 North Union Street | | |
| Fostoria, Ohio  44830 | : | |
| | | |
| SENECA RE-AD INDUSTRIES, INC., | : | |
| 780 East SCR 20 | | |
| Tiffin, Ohio  44883 | : | |
| | | |
| and | : | |
| | | |
| SENECA COUNTY BOARD OF | : | |
| DEVELOPMENTAL DISABILITIES | | |
| 780 East SCR 20 | : | |
| Tiffin, Ohio  44883 | | |
| | : | |
| Defendants. | | |

**COMPLAINT**

## I.      INTRODUCTION

Plaintiffs Pamela Steward, Ralph "Joe" Magers, and Mark Felton bring this Complaint

against Defendants Roppe Corporation ("Roppe"), Seneca Re-Ad Industries, Inc. ("Seneca"),

and the Seneca County Board of Developmental Disabilities ("SCBDD") for damages, declaratory and injunctive relief, costs and attorneys' fees, and pre-judgment and post-judgment interest, and allege as follows:

1.      Roppe is a leading manufacturer of commercial flooring products, including rubber and vinyl flooring tiles.  It does tens of millions of dollars in business annually and its products are distributed across the globe.

2.      Since 1984, Seneca has operated Roppe's Sampling Division in a building co located on a campus with other Roppe divisions.  The samples that Seneca produces are an integral part of Roppe's business and production process.  Individuals who work in the Sampling Division produce samples of Roppe flooring materials using processes and methods specified by Roppe.  Because they are often the first examples of Roppe's products that potential customers see, Roppe's customers worldwide rely on the samples produced at Seneca to consider and choose from its various product lines, which directly influence Roppe's overall sales.  Seneca does not perform work for any other business besides Roppe.

3.      But for a single bus driver, Seneca only employs individuals with disabilities. The individuals who work in Roppe's Sampling Division are supervised by employees of SCBDD pursuant to a written agreement between Seneca and SCBDD.  SCBDD supervising staff oversee the daily activities of individuals who work in the Sampling Division, assign them work, and make hiring and firing decisions according to Roppe's standards.  In this regard, SCBDD staff are directly involved in, and make daily decisions about, the conditions of employment of individuals in the Sampling Division.

4.      All three Plaintiffs are employed in Roppe's Sampling Division.  Since their respective employments began, Roppe and Seneca have continuously discriminated against

2

Plaintiffs solely on the basis of their disabilities by: segregating them from non-disabled employees; paying them less than non-disabled employees; denying them the same benefits and privileges afforded to other, non-disabled, employees; failing to individually assess them on all of the essential functions of their positions and on other jobs within Roppe; and failing to provide them with reasonable accommodations in light of their known disabilities and despite numerous requests for such accommodations.  Thus, Roppe and Seneca have violated Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111, *et seq*., and Ohio state law, which is interpreted *in pari materia* with the ADA.  *See* Ohio Rev. Code § 4112.02; *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 872 (6th Cir. 2007).

5.      SCBDD has aided and abetted Roppe's and Seneca's discriminatory conduct in violation of Ohio Rev. Code § 4112.02(J) by making employment decisions on behalf of Seneca and Roppe that have resulted in Plaintiffs' unlawful segregation in the Sampling Division of Roppe without an opportunity to be considered for, and to be individually assessed on, jobs in other Roppe divisions; overseeing Plaintiffs' day-to-day operations in Roppe's Sampling Division, including relegating Plaintiffs to certain tasks within Roppe's Sampling Division based on erroneous assumptions about their disabilities; and by unjustifiably denying Plaintiffs' requested reasonable accommodations.

6.      Plaintiffs seek declaratory and injunctive relief, as well as compensatory and punitive damages to remedy the multiple harms they have suffered.

## II.      JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction over Plaintiffs' claims under the ADA pursuant to 28 U.S.C. § 1331 (federal question) and over Plaintiffs' claims under Ohio state law pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction) because Plaintiffs' claims arise out of

the same nucleus of operative fact and form part of the same case or controversy as Plaintiffs' claims under the ADA.

8. Venue is proper pursuant to 28 U.S.C. § 1391(b) because all of the parties are residents of this judicial district and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## III. PARTIES

### Plaintiffs

9. Plaintiff Pamela Steward is a resident of Tiffin, Ohio. She is blind in her right eye and has an intellectual disability, asthma, and colitis. Ms. Steward's impairments substantially limit her in one or more major life activities, including but not limited to seeing, concentrating, thinking, breathing, and digestive functions. Ms. Steward has been employed by Defendants at their facility in Fostoria, Ohio, located in Seneca County, since April 12, 2010. She is an otherwise qualified individual with a disability subject to the protections afforded under Title I of the ADA, 42 U.S.C. §§ 12111, *et seq*., and Ohio Rev. Code § 4112, *et seq*.

10. Plaintiff Ralph "Joe" Magers is a resident of Tiffin, Ohio. He is a person with optic atrophy and is legally blind. Mr. Magers' impairments substantially limit him in one or more major life activities, including but not limited to seeing. Mr. Magers has been employed by Defendants at their facility in Fostoria, Ohio, located in Seneca County, since January 21, 2010. He is an otherwise qualified individual with a disability subject to the protections afforded under Title I of the ADA, 42 U.S.C. §§ 12111, *et seq*., and Ohio Rev. Code § 4112, *et seq*.

11. Plaintiff Mark Felton is a resident of Tiffin, Ohio. He is a person with autism. Mr. Felton's impairments substantially limit him in one or more major life activities, including but not limited to concentrating, thinking, and communicating. Mr. Felton has been employed by Defendants at their facility in Fostoria, Ohio, located in Seneca County, since December 5,

4

2011.  He is an otherwise qualified individual with a disability subject to the protections afforded under Title I of the ADA, 42 U.S.C. §§ 12111, *et seq*., and Ohio Rev. Code § 4112, *et seq*.

### Defendants

12.      Defendant Roppe Corporation was founded in 1955 and is a subsidiary of Roppe Holding Company.  Both its headquarters and its Sampling Division are located in Fostoria, Ohio.  Today, its products are distributed worldwide to 110 U.S. cities, 7 locations in Canada, and another 27 locations internationally.  In 2017, its annual sales were approximately $72.7 million.  Its President and CEO is Donald P. Miller.  Roppe has a contractual agreement with the Seneca County Commissioners (i.e., the elected body administering public services in Seneca County, Ohio) to provide building space for Seneca to operate its Sampling Division.  At all times material to this Complaint, Roppe had 15 or more employees and was an "employer" within the meaning of the ADA.  On information and belief, Roppe employs between 51 and 200 people.

13.      Defendant Seneca Re-Ad Industries, Inc., is a non-profit corporation with an administrative office in Tiffin, Ohio, and its primary location in Fostoria, Ohio that functions as Roppe's Sampling Division.  Seneca contracts with SCBDD for SCBDD employees to provide "staff and facilities" to implement the employment-related support services to adults with intellectual and developmental disabilities in Seneca County, Ohio who are employed in Roppe's Sampling Division, including supervision of Plaintiffs' day-to-day job tasks.  SCBDD and Seneca Non-Profit Board November 2, 2016 Month to Month Agreement attached hereto as Exhibit 1.  At all times material to this Complaint, Seneca had 15 or more employees and was an "employer" within the meaning of the ADA.  According to the Wage and Hour Division of the United States Department of Labor, as of July 1, 2018, Seneca employed 133 individuals with disabilities.

14.     Defendant Seneca County Board of Developmental Disabilities is a public entity that, among other things, plans, funds, and provides employment-related services for individuals with disabilities.  It also continuously recruits and refers eligible workers with disabilities to Seneca to perform jobs in Roppe's Sampling Division.  As stated above, SCBDD staff oversee Roppe's Sampling Division and work with Roppe employees to maintain Roppe's facilities and equipment.

## IV.     FACTUAL BACKGROUND

### Seneca is Created Solely to Serve as Roppe's Sampling Division.

15.     Starting with an initiative spearheaded by CEO Don Miller in 1984, Roppe offered SCBDD's Adult Services Group Roppe-owned space to operate and administer Roppe's Sampling Division.

16.     Today, Roppe provides facilities, equipment, maintenance, and staffing to Seneca; Seneca provides labor, through its employees with disabilities, to manufacture flooring samples exclusively for Roppe as its Sampling Division; and SCBDD provides staffing and support services to manage and supervise workers in the Sampling Division.  SCBDD employees also work directly with Roppe employees to maintain Roppe's facilities and equipment.

17.     More than 100 individuals with disabilities, including Plaintiffs, work in the Sampling Division, which is located in a building adjacent to Roppe's engineering department and other offices.  The Sampling Division produces more than 25 million merchandise samples for Roppe per year.

18.     Defendants' arrangement was described in a 2017 Fiscal Year Audit ("2017 Audit") prepared by the Ohio State Auditor:

Roppe Rubber[1] has entered into an agreement with the Seneca County Commissioners.  Roppe Rubber is providing building space to carry on workshop activities including maintenance, insurance, and taxes.  As long as the workshop performs work and assembles parts and products for Roppe Rubber, no rent will be charged for the use of the building.

The Seneca Board of Developmental Disabilities provides salaries, benefits, workshop space, and other costs to Seneca Re-Ad Industries.

David Yost, *Seneca County Single Audit for the Year Ended December 31, 2017* 82 (Ohio Auditor) (2017), https://ohioauditor.gov/auditsearch/Reports/2018/Seneca_County_17_Seneca.pdf.

19.     The 2017 Audit also states:

[Seneca] has contracted with [SCBDD] to provide sheltered employment for developmentally disabled or handicapped adults in Seneca County.  Responsibility for the provision of sheltered employment is with the Board of Trustees of Seneca . . . , an eight member self-appointing board that operates within the defined duties and stated rules of [SCBDD].  [Seneca] receives all reasonable and just utility costs for the basic operations of this program from [SCBDD].  The staff, facilities, equipment, supplies and materials necessary for basic operation and care of the grounds and facility for the [Seneca] program are also provided by [SCBDD]. . . .

*Id*. at 80.

20.     Audit reports from FY 2004 to present reveal that Roppe expends $69,600 per year for Seneca to use its facilities and equipment.

21.     Roppe also provides the supplies and materials necessary for Seneca to operate its Sampling Division, as well as technical assistance and support directly to the SCBDD staff who supervise Seneca employees.

22.     Roppe has at least two staff members dedicated to working with SCBDD staff to maintain the Roppe-owned equipment and to schedule work in the Sampling Division.  For

---

[1]  Roppe Rubber is a prior name for the Roppe Corporation.

example, when a technical problem arises with the Roppe-owned equipment in the Sampling Division, a Roppe technician is called to fix the machine at issue.

23.    Unlike other sheltered employment settings for people with disabilities,[2]  where a production facility may serve a variety of customers, Seneca supplies labor and products exclusively for Roppe's benefit.  The 2017 Audit found that Roppe "provided 81% of the revenue and services to Seneca Re-Ad," a volume of business that, if canceled, "would have a severe impact on the production operations of Seneca Re-Ad."  Id. at 82.  Upon information and belief, the remaining 19% of revenue and services to Seneca is derived from public funding sources.

24.    Roppe also directly influences the method, materials, equipment, processes, and volume of work performed by Seneca.

25.    The number of samples produced by each individual at Seneca for Roppe depends on the amount of materials provided by Roppe, its sales volume, and its customer demand. When Roppe does not provide enough product for Seneca employees, the employees are not permitted to work and do not earn wages for that day.

26.    Roppe, by and through Seneca and SCBDD supervisory staff, controls the conditions of employment for workers at Seneca.  Roppe staff members work with SCBDD and Seneca staff to operate Roppe machinery.  SCBDD staff manage Seneca workers based on Roppe's production standards, including daily assignments to various tasks that are part of the Sampling Division.  Seneca staff produce samples in accordance with Roppe guidelines and

---

[2]  "Sheltered employment" refers to a "setting in which people with disabilities receive services and training to develop work-related skills."  Amy J. Armstrong, *Sheltered Employment*, Ency. of Clinical Neuropsychology (Kreutzer, Jeffrey S., DeLuca, John, and Caplan, Bruce 2011), *available at* https://link.springer.com/referenceworkentry/10.1007%2F978-0-387-79948-3_427.

processes.  Roppe's internal safety regulations and management of its building and equipment must be closely adhered to by SCBDD and Seneca employees.

27.     Roppe controls the process by which Seneca receives and distributes Roppe's samples.  A Seneca material handler is responsible for picking up product from other Roppe divisions and dropping it off to the Sampling Division for samples to be produced.  When samples and vinyl corners are completed at Seneca, they are placed directly into shipment boxes containing Roppe's logo and immediately placed into the stream of commerce and sent to various customers across the globe.

28.     Defendants' close relationship is no secret.  They advertise the interdependence of their operations, common management, centralized control of labor relations and personnel, and common ownership and financial control widely in the press and in their own promotional materials.  For example:

•     A 2011 article published by the Ohio Department of Developmental Disabilities ("ODDD") states that "[b]ehind the Roppe product samples seen at home improvement stores and building supply centers around the world are the more than 100 individuals who work [for S Seneca]."  It describes "[t]he individuals [at Seneca]" as "a totally integrated part of the [Roppe] organization."  An SCBDD supervisor is quoted as stating, "we know if we have a question, we can go to one of the Roppe staff – including [CEO] Don Miller!"  And CEO Don Miller himself is quoted as saying, "We always take our customers on a tour through the sample production area.  They tell us this is what they remember about our company – the people working there.  I'm proud of that . . . and of them."  The article also quotes then-SCBDD Superintendent Lew Hurst who states,

"[m]ost impressive to me is that the work performed in the Sample Division is such a natural community work environment.  We couldn't be more a part of the Roppe team."

See John Martin, *In Seneca County, Roppe Corp. Offers Solid Employment Opportunities in Fostoria*, Pipeline Quarterly (Spring 2011), attached hereto as Exhibit 2.

- A 2014 video published by SCBDD on YouTube shows an interview with Roppe's then-marketing manager, Jeremy Whipple, who states that he serves as the Vice President of Seneca's Board of Directors.  The video includes an interview with Robin Briggs, Roppe's Marketing Sample Project Coordinator, who states, "Every part, every tile, everything that Roppe has as far as material, we sample it and it goes through [Seneca]."  The video also shows Seneca workers wearing shirts bearing the joint company insignia "Seneca Re-Ad/Roppe."

See Seneca Cty. Bd. of Dev. Disabilities, *Seneca Re-Ad Industries – Tiffin and Fostoria Ohio – Seneca County Board of DD*, YouTube (Oct. 1, 2014).[3]

- In a 2014 article in the Fostoria Review Times, Roppe's then-Marketing Projects Manager, Brian Cooper, states, "We look at them [Seneca] as another Roppe division and treat [i]t like another Roppe entity."  The article goes on to state,

> Seneca Re-Ad employees produce the entire sample line for Roppe.  They cut the material into the appropriate and designated shape before the pieces are stacked and taken to a table to be stamped with the [Roppe] logo, part number, part name, color and specs. . . .  Roppe Corp. benefits from the joint venture because it allows all work to be done locally and gives the company quick access to inventory[.]

Morgan Manns, *Roppe, Seneca Re-Ad Celebrate 30 Years Together*, Review Times (Nov. 15, 2014).

- In a 2015 article in the Toledo Blade, Rodney Biggert, the current Director of Adult Services at SCBDD, indicates that Seneca workers are paid directly by Roppe:

---

[3] *Available at* https://www.youtube.com/watch?v=6vHyyTpcT9k.

"[E]mployees are paid by the companies they work for – in this case Roppe – in a

subcontract partnership with the county board."

Lauren Lindstrom, *Below-Minimum Pay for Disabled Challenged*, Toledo Blade (Nov. 19, 2015,

12:00 a.m.).[4]

29.     Simply put, without Roppe's product, building, equipment, and oversight (directly

and indirectly through SCBDD staff), Seneca would cease to exist.

### Plaintiffs are Relegated to Roppe's Sampling Division Based on Their Disabilities and Denied Opportunities for Cross-Training.

30.     Mr. Magers began working in Roppe's Sampling Division in January 2010;

Ms. Steward in April 2010; Mr. Felton in December 2011.

31.     Roppe's method for assigning employees to its Sampling Division is different

than its method for hiring employees in all of its other divisions.  Traditionally, individuals

applying for employment at Roppe apply through widely circulated job postings.  In contrast, an

individual employed in Roppe's Sampling Division must be referred to the Sampling Division by

SCBDD based on their eligibility for disability related services.

32.     Upon information and belief, Roppe requires that workers in its Sampling

Division at Seneca must be persons with disabilities who qualify for services with SCBDD.

33.     That is how Plaintiffs ended up working in the Sampling Division.  SCBDD

pipelined Plaintiffs directly to Seneca to work in Roppe's Sampling Division, and they were

never considered or individually assessed for employment in other Roppe divisions.

34.     Indeed, once they arrived in the Sampling Division, Plaintiffs were segregated

from other employees in Roppe's production process and were only permitted to work with other

---

[4]  *Available at* https://www.toledoblade.com/local/2015/11/19/Below-minimum-pay-for-disabled-challenged.html.

employees with disabilities, SCBDD supervising staff, and the Roppe workers assigned to maintaining Roppe's equipment used in the Sampling Division.

35.    There, SCBDD supervising staff, pursuant to SCBDD's agreement with Seneca, assigned Plaintiffs to certain tasks within the Sampling Division.

36.    The tasks to which employees are assigned impact both their compensation and their skill development.  Tasks in the Sampling Division are compensated at different rates.  For example, certain tasks, such as working as a product sampler, are paid at a flat hourly rate — as much as $9.00 per hour.  Other tasks, like the "double auto pad print" are compensated at a piece-rate,[5] where the amount a worker earns is based on the amount the worker produces, which is further dictated by the amount of product Roppe supplies.  The different tasks also involve training that ostensibly provides a Seneca employee with a range of competencies and skill sets in different areas of the production process.  Thus, the ability to cross train in different tasks provides employees the benefit of developing different skills and experience, as well as the possibility of higher compensation.

37.    According to the 2011 ODDD Pipeline article (Exhibit 2), SCBDD staff purport that all Seneca workers cross-train in all tasks that make up the Sampling Division; in reality, however, Plaintiffs have been denied access to tasks within the division that are essential parts of the sample assembly job based on stereotypical assumptions about their capabilities and outright refusals to provide them with reasonable accommodations.

38.    In fact, since the beginning of their employment, SCBDD staff (on behalf of Roppe and Seneca) have assigned Plaintiffs to the same mundane and rote tasks based on erroneous assumptions about their individual disabilities and have refused to even assess

_____

[5]  A piece-rate job means that employees are compensated based on the number of pieces they produced while performing a given task.

Plaintiffs' ability to perform certain tasks in the Sampling Division despite multiple requests that they do so.

39.     For example, Mr. Magers, who is blind, has been prohibited from working on multiple machines in the Sampling Division out of "concern" that he may harm them. Specifically, one of the SCBDD supervisors informed Mr. Magers that he could not work on the drill press even though he has successfully operated the machine in the past.

40.     Further, both Ms. Steward and Mr. Magers have been categorically denied access to certain machines because they are not accessible[6] to individuals with visual impairments or who are blind.

41.     When Plaintiffs raised this with Seneca, Seneca's counsel responded, "We fail to see why [Seneca] should modify machines Mr. Magers [and Ms. Steward] do . . . not utilize in [their] job[s]."  Seneca maintained that it, through SCBDD supervising staff, has the sole discretion to assign employees to certain tasks within the Sampling Division.

42.     Likewise, Mr. Felton was told that he cannot access certain machines, like the auto print machine and the drill press/corner holes machine, because of his behavior of taking occasional breaks on the job.  As discussed below, Mr. Felton's need for occasional short breaks is the direct result of his autism, for which Mr. Felton requested an accommodation and was denied.

43.     Seneca's circular reasoning is contrary to SCBDD's claim that all Seneca employees are cross-trained in every task that make up the Sampling Division; moreover, it ensures that Plaintiffs will never gain additional skills and experience on the machines that are not accessible.  By Seneca's logic, if the machines are not accessible, Plaintiffs will not be

---

[6] The term "accessible" means "how something is designed to be used, reviewed, read, or otherwise accessed by someone who is living with a disability or impairment of some kind."  Paul Scherffius, *Why Accessibility Maters*, brailleworks.com (Dec. 30, 2016, 9:12 a.m.), https://brailleworks.com/accessibility-matters/.

assigned to work on them, and if Plaintiffs are not assigned to work on them, they will never be made accessible.

44.     The tasks from which Plaintiffs were excluded on the basis of their disabilities would have provided them with the opportunity to operate more advanced equipment and machinery (rather than continuing to perform mostly manual tasks like assembly-line work); to acquire additional vocational skills and opportunities in doing so; and are associated with greater compensation and benefits both in the Sampling Division and across other divisions of Roppe and the competitive labor market.

### Plaintiffs are Compensated at Rates Lower than Non-Disabled Employees Working in Other Roppe Divisions.

45.     When Plaintiffs were relegated to Roppe's Sampling Division, they were barred from earning competitive wages similar to non-disabled workers in other Roppe divisions.

46.     Until February 2016, Plaintiffs were erroneously paid less than minimum wage (as little as $2.00 per hour) under the guise of certificates issued to Seneca by the United States Department of Labor to Seneca pursuant to 29 U.S.C. § 214(c) (i.e., "14(c) certificate").  As part of the 14(c)-certificate program, under the Fair Labor Standards Act ("FLSA"), Seneca is permitted to pay only individuals with disabilities who are "disabled for the work performed" subminimum wages.

47.     In contrast, workers with disabilities who are not "disabled for the work performed" (*i.e.*, workers who do not have disabilities that impair their productivity in performing a specific job) must be paid at least the minimum wage in accordance with the FLSA and the Ohio Constitution.  The Ohio minimum wage in 2018 is $8.30 per hour.

48.     Even though Roppe is not a 14(c)-certificate holder, it relied on Seneca's certificate to profit from the reduced labor costs of work performed by Plaintiffs because they

14

were compensated at a subminimum wage, rather than the Ohio minimum wage or wages that are commensurate to other non-disabled workers performing similar manufacturing tasks in other Roppe divisions.

49.     In February 2016, after successfully petitioning the Department of Labor to review their wages, Plaintiffs were found to have been misclassified and erroneously placed in the 14(c) program, and they subsequently began to earn minimum wage, even as their request for unpaid minimum wages for the years that they worked in the Sampling Division continues to be reviewed, at the request of Seneca, by the Department of Labor.[7]

50.     Today, Roppe and Seneca have placed an artificial cap on Plaintiffs' wages at the Ohio minimum wage, regardless of what task they perform or how productive they are. Plaintiffs are compensated at $8.30 per hour on every task they perform in the workshop.  In contrast, the average hourly rate for a worker in other Roppe divisions is $16.47 per hour, with some making upwards of $25.50 per hour.

51.     Plaintiffs are similarly compensated at the Ohio minimum wage when they perform piece-rate tasks, regardless of how many pieces they produce.  Prior to February 2016, when Plaintiffs were paid subminimum wages, they were, at times, able to perform enough piece-rate work in the Sampling Division to earn wages that exceeded the minimum wage. However, since Plaintiffs successfully challenged their subminimum wages, that opportunity has been taken away and their wages have been artificially capped.  Upon information and belief, this is true even though employees in other Roppe divisions who perform similar piece-rate work are compensated based on the amount of product they produce, with the potential to be compensated at rates higher than the Ohio minimum wage.

---

[7] *See Ralph Magers, et al., v. Seneca Re-Ad Industries, Inc.*, 2016-FLS-003 (Dep't of Labor Feb. 2, 2016) (decision and order); *Ralph Magers, et al. v. Seneca Re-Ad Industries, Inc.*, ARB 16-038, ARB 16-054, 2016-FLS-003 (Dep't of Labor Jan. 12, 2017) (decision and order reversing, in part, and remanding).

52.     Roppe and Seneca compensate Plaintiffs at this reduced rate despite knowing that workers like Plaintiffs are, in some instances, more productive than non-disabled workers in other divisions.  For example, at one point, Roppe job-tested individuals working for the company in a temporary-employment capacity and found that workers at Seneca out-produced them by 35%.  Nevertheless, Plaintiffs, who have a combined total of 23 years of experience working in Roppe's Sampling Division, have had their wages capped at $8.30 per hour by their employer.

53.     Moreover, Plaintiffs are only permitted to work for a limited number of hours per week.  The Sampling Division's operating hours are restricted to 25 hours per week, and Plaintiffs are not permitted to try out for other divisions of the company in the same production process should they want to work more hours per week within the company than the Sampling Division affords.

### Plaintiffs are Denied Equal Benefits of Employment Afforded to Non-Disabled Workers at Roppe.

54.     In addition to being denied wages equal to those afforded to others in the Roppe production process, Plaintiffs are denied access to the same benefits and privileges of employment that are afforded to their non-disabled colleagues.

55.     Roppe boasts on its website that it "has low turnover rates due to [its] excellent benefits and compensation plans."  Roppe Corporation, *About Us* (2017).[8]  Those benefits include profit sharing, 401(k) plans, pension plans, health insurance, and disability insurance.

56.     Because Plaintiffs work in Roppe's Sampling Division, there are no health or other financial benefits afforded to Plaintiffs.

---

[8] *Available at* https://roppe.com/about-us.

57.     Upon information and belief, although Plaintiffs accrue some vacation time, the vacation time they accrue is at a rate different from other, non disabled workers performing similar tasks in other Roppe divisions.

### Plaintiffs are Denied Equal Access to Promotional Opportunities.

58.     According to Roppe's website:  "Roppe believes in a leadership philosophy that encourages participation, self-management, and determination for success.  We promote advancement from within when possible and are proud to promote equal employment opportunities and prohibit harassment in our workplace."

59.     Although advancement opportunities may be available to employees working in other divisions of Roppe, they are not available to Plaintiffs.  In letters from Seneca's counsel, Plaintiffs were informed that, "given the horizontal nature of the structure at Seneca Re-Ad, we are aware of no opportunity for advancement.  No promotion is available to [Plaintiffs]."

60.     Thus, persons with disabilities assigned to Roppe's Sampling Division are, by design, not eligible for "advancement from within" Roppe.  Indeed, in another letter Seneca's counsel wrote that "there is no advancement available, there are no other positions, and there are no greater benefits associated with any particular task."

61.     Moreover, Defendants' refusal to allow Plaintiffs to perform all of the essential functions of their jobs in the Sampling Division ensures that even if Plaintiffs did have opportunities for advancement like non-disabled workers in other divisions of Roppe, they would be far less likely to be considered for such positions because they would not have acquired the requisite skills or experience as a result of the limitations that Defendants have imposed.

### Defendants Have Not Individually Assessed Each Plaintiff.

62.     Plaintiffs are further subjected to discrimination within the Roppe Sampling Division itself.  The essential functions of a job in the Sampling Division are that an individual:

17

(1) be a person with a disability that is qualified to receive services from SCBDD; (2) is available to receive vocational training on the tasks that make up the Sampling Division; and (3) can rotate within those tasks to receive the full range of training.

63.     Beginning in August 2017, Plaintiffs, through a series of written requests sent by their attorneys,[9] requested that they be individually assessed on each task in the Roppe Sampling Division to determine whether they could perform each task with or without reasonable accommodations.

64.     Plaintiffs asked that they be afforded an individualized assessment with the assistance of a job coach.  In requesting the assistance of a certified job coach, Plaintiffs sought a neutral third-party who is properly trained in each of Plaintiff's individual disabilities to assist the Plaintiffs with identifying reasonable accommodations, if any, and appropriate training. Plaintiffs' request specified that the use of a job coach would be limited to assessing each Plaintiff on all of the areas available for cross-training in Roppe's Sampling Division (*e.g.*, all of the Sampling Division job's essential functions) and to determine what, if any, reasonable accommodations each Plaintiff may need to perform each task in their position.

65.     In response, counsel for Seneca stated that Plaintiffs are not entitled to an individualized assessment, and that it has unfettered discretion (through its agents, SCBDD supervising staff) to assign Plaintiffs to tasks where and when it wishes.  In a letter from Seneca's counsel, Seneca took the position that "[u]nless [Plaintiffs are] assigned to a particular job, [they] ha[ve] no need to be trained on that job."

66.     Seneca denied that it was responsible for an individualized assessment and instead referred Plaintiffs to SCBDD generally for job coaching and training.

---

[9]  All written requests referenced herein were directed to Seneca and/or its counsel and Roppe.

67.     Moreover, Seneca denied Plaintiffs' request for this reasonable accommodation despite: (1) its admission that "there is one job at Seneca Re-Ad" which "consists of many tasks that must be done in order to complete the finished product"; (2) its history of assigning Plaintiffs (through SCBDD supervising staff) to tasks based on erroneous and stereotypical assumptions about what Plaintiffs can or cannot do as a result of their disabilities; and (3) its long track record of unjustifiably excluding Plaintiffs from certain essential job functions.

68.     To date, Defendants have not provided Plaintiffs with either a job coach for the limited purpose of conducting an individualized inquiry or a meaningful opportunity to have such an assessment performed.  Nor have Defendants' staff provided such an individualized assessment directly or allowed Plaintiffs the opportunity to access all of the essential functions of the Sampling Division job with or without reasonable accommodations, even though Plaintiffs are otherwise qualified to perform them.

**Plaintiffs Are Denied Reasonable Accommodations.**

69.     As otherwise qualified individuals with disabilities working in Roppe's Sampling Division, Plaintiffs are entitled to reasonable accommodations that permit them to perform the essential function of their jobs.

70.     In accordance with the ADA, from August 25, 2017 through March 5, 2018, Plaintiffs, through their attorneys, sent a series of written requests for accommodations on the tasks that they perform in the Sampling Division to Seneca, its counsel, and Roppe.[10]  Seneca responded through counsel.

---

[10]  Plaintiffs in no way suggest that their disabilities render them disabled for the work they perform.  Rather, Plaintiffs are otherwise qualified individuals who, with or without reasonable accommodations, are able to perform the essential functions of the Sampling Division.

71.     Upon information and belief, Roppe authorizes Seneca, by and through its contractual relationship with SCBDD, to assess whether an employee working in Roppe's Sampling Division requires accommodations and to grant or deny an employee's request.

72.     Ms. Steward requested that she be provided job training on all tasks in an accessible format.  For example, when Ms. Steward was trained on tasks in the past, SCBDD supervisors provided her with written instructions in a size and font that, due to her visual impairment, were unreadable and that otherwise lacked sufficient description and demonstration of the task to be performed.  Ms. Steward requested that she receive instruction and training in a format that includes verbal prompts, detailed instruction of individual tasks, and tactile training. She further requested that the training be of a sufficient duration to allow her to understand the instruction.

73.     Defendants have yet to provide Ms. Steward with descriptions of the jobs she performs in an accessible format or to provide her demonstrative training in the manner requested, even despite counsel's requests.

74.     Moreover, Seneca took the position that despite counsel's request for accessible written materials, it would continue to provide Ms. Steward with the same inaccessible written training materials because she could ask her supervisors for oral instruction.

75.     Ms. Steward also requested that when she is assigned to the "saw" (a task involving cutting wood pieces that produces airborne rubber dust and fumes), she be provided with a protective mask so as not to exacerbate her asthma.  She requested a mask on a weekly basis.

76.     Seneca's counsel responded that "dust masks are available whenever [Ms. Steward] desires one, and that no request for a dust mask has ever been denied."

77.     Despite counsel for Ms. Steward's repeated requests for a mask on a weekly basis, SCBDD staff flatly rejected Ms. Steward's requests and have told her that she can only receive a mask on a monthly basis or she cannot receive a new mask until the one she has been previously provided is no longer useable because it is visibly soiled.

78.     Defendants' failure to provide Ms. Steward with a reasonable accommodation while working on the saw has exacerbated the effects of her asthma.

79.     Ms. Steward also informed Defendants that when she is assigned to assembly line-style tasks and placed at the end or middle of the process she is often too fast when working with others, which causes her to be anxious and exacerbates the symptoms of her colitis.  She requested that such tasks be modified so that she could work autonomously and at her own pace, or on the front of the line.

80.     Seneca refused to consider Ms. Steward's request or provide her with an alternative reasonable accommodation.

81.     Mr. Magers requested that he be provided with training material in an accessible format.  Because Mr. Magers is blind, the written job instructions SCBDD supervisors provide him with are completely useless to him.  Mr. Magers requested that his training consist of in-person demonstrations (performed by SCBDD supervisory staff) of machines and work stations and that he receive demonstrations including descriptive language of the machines/equipment and tactile training.

82.     Defendants have yet to provide Mr. Magers with descriptions of the jobs he performs in an accessible format or to provide him demonstrative training in the manner requested, even despite counsel's requests.

83.     Mr. Magers is often assigned to place multiple tiles on a chain to create different samples.  The tiles are often not organized and are in the incorrect order when they are given to him.  Due to his visual impairment, he is unable to see when different colored tiles are given to him out of order.  He requested that Defendants reorganize his work station so that the tiles are organized by color and in the correct position.

84.     In response, Defendants claimed that such organization by color and the positioning of the tiles was already being done.  However, Mr. Magers continues to encounter disorganized and out of order tiles that unnecessarily impede the quality of his work on this task.  Despite repeated requests, Defendants have taken no steps to afford him a reasonable accommodation.

85.     With respect to Mr. Felton, due to his autism, he requires short, periodic, and flexible breaks in order to prevent himself from becoming over-stimulated and to reorient himself.  SCBDD supervisors have disciplined Mr. Felton in the past when he has averted his eyes from his work station or spoken to coworkers while he is working in a specific task, which manifested due to his lack of breaks.

86.     Mr. Felton requested that, in addition to regularly-scheduled breaks given to all employees, he be given periodic, short breaks if and when he needs them to reorient himself.  Defendants denied Mr. Felton's request.

87.     Mr. Felton also requested that he be trained in an accessible format.  Specifically, he requested that he receive training using verbal prompts and detailed instruction of individual tasks in a duration sufficient for him to understand the instruction.

88.     Seneca took that position that "[i]f Mr. Felton does not understand what he is expected to do, he can communicate the need for further instruction to his supervisors, something he has not done to our knowledge."

89.     Defendants have yet to provide Mr. Felton with descriptions of the jobs he performs in an accessible format or to provide him training in the manner requested, even despite counsel's requests.

90.     Moreover, Seneca stated that "[W]hile quality of product is not used as a basis for paying an employee, it certainly can be a factor in assigning an employee to a particular work location."  Thus, Defendants have unjustifiably denied Plaintiffs the accommodations that would allow them to perform the essential functions of their jobs and ostensibly increase the quality of their production, while using product quality as a criterion to determine whether Plaintiffs can perform other essential functions of their jobs (or other jobs within the company) that they are otherwise qualified to perform.

91.     At no point in its correspondence with Plaintiffs' counsel did Seneca assert that any of Plaintiffs' requests would pose an undue hardship.

92.     Plaintiffs sent their last correspondence related to their requests for reasonable accommodations on March 5, 2018; Plaintiffs have not received a response since.

93.     Plaintiffs filed timely Charges of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which were received by the EEOC on April 30, 2018, alleging, inter alia, discriminatory practices by Roppe and Seneca.  As part of its Priority Charge Handling Procedure, the EEOC requested supplementary charges from Plaintiffs, which Plaintiffs duly submitted and the EEOC received on September 11, 2018.

94.     By Notices dated September 19 and 21, 2018, the EEOC issued right to sue letters to each Plaintiff with respect to Roppe and Seneca.  This action timely follows.

## V.     CAUSES OF ACTION

### COUNT I

### Violations of Title I of the Americans with Disabilities Act
### Discriminatory Terms, Conditions, and Privileges of Employment

**(Against Roppe and Seneca)**

95.     Plaintiffs incorporate all of the foregoing allegations as if fully stated herein.

96.     Title I of the ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Roppe and Seneca have violated that prohibition by:

•     denying Plaintiffs equal access to job training opportunities across Roppe and within the Sampling Division;

•     depriving Plaintiffs of equal access to, or an individualized assessment on, all of the essential functions of their position in the Roppe Sampling Division, even though they were otherwise qualified to perform them;

•     denying Plaintiffs an individualized assessment on positions at Roppe other than those in the Sampling Division on the basis of their disabilities;

•     denying Plaintiffs compensation and pay equivalent to that received by non disabled employees working in other Roppe divisions;

•     denying Plaintiffs other terms, conditions, and privileges of employment afforded to non-disabled employees in other Roppe divisions such as profit sharing, 401(k) plans, pension plans, health insurance, disability insurance, and equivalent vacation time; and

- denying Plaintiffs equal opportunities for advancement and promotional opportunities afforded to non-disabled employees performing similar work in Roppe's production process.

97.     Roppe's and Seneca's conduct has adversely affected Plaintiffs' opportunities and status because they are deprived of equal access to experience and skill development, compensation, advancement opportunities, and benefits based on erroneous assumptions about their disabilities.

98.     Roppe's and Seneca's conduct caused Plaintiffs substantial economic damages as measured by the difference between their actual rate of pay, pay-related benefits (or lack thereof), and the amounts earned and accrued by workers in similar manufacturing positions in the other divisions of Roppe.  Moreover, Roppe's and Seneca's conduct in placing an artificial cap at the Ohio minimum wage on Plaintiffs' wages is discriminatory and continues to cause them economic damages now and into the future.  Plaintiffs are entitled to be paid prevailing wages for the job that they perform going forward.

99.     Because Roppe and Seneca are part of a single, integrated enterprise and/or are joint employers, Roppe and Seneca are jointly and severally liable for Plaintiffs' compensatory damages.  Because they acted with malice or with reckless indifference towards Plaintiffs and their rights under the ADA, they are also liable for punitive damages.  Finally, Roppe and Seneca are liable for the court costs, reasonable attorneys' fees, and expenses Plaintiffs have incurred in the prosecution of this matter.

## COUNT II

### Violations of Title I of the Americans with Disabilities Act
### Discriminatory Criteria and Qualification Standards

**(Against Roppe and Seneca)**

25

100.     Plaintiffs incorporate all of the foregoing allegations as if fully stated herein.

101.     Title I of the ADA prohibits an employer from "limiting, segregating, or classifying [an] employee in a way that adversely affects the opportunities or status of such . . . employee because of the disability of such . . . employee." 42 U.S.C. § 12112(b)(1).  Roppe and Seneca violated this prohibition by relegating Plaintiffs to Roppe's Sampling Division, a segregated division of the company with only employees with disabilities present (except for SCBDD supervisors and Roppe support staff) without an adequate individualized inquiry into their skills and abilities and, instead, based only on general assumptions about the limitations imposed by Plaintiffs' disabilities in a way that adversely affects their job status, employment opportunities within Roppe, and overall employment prospects in the open market.

102.     Title I further prohibits an employer from participating in an "arrangement or relationship that has the effect of subjecting" an employee to discrimination based on disability. 42 U.S.C. § 12112(b)(2).  Roppe and Seneca have discriminated against Plaintiffs by participating in an arrangement or relationship with SCBDD that had the effect of subjecting the Plaintiffs, qualified individuals with disabilities, to prohibited discrimination in violation of 42 U.S.C. 12112(b)(2), including:

• the discriminatory provision of vocational training, supervision, and job assignment decisions;

• the failure to individually assess Plaintiffs before excluding them when they were otherwise qualified to perform other tasks and positions;

• the denial of reasonable accommodations; and

• other actions or inactions committed by and delegated to SCBDD funded staff.

103.     Moreover, an employer is prohibited from utilizing standards, criteria, and methods of administration that have the effect of discrimination based on disability.  42 U.S.C. § 12112(b)(3).  Roppe's and Seneca's actions (or inactions) in utilizing standards, criteria, and methods of administration with regard to job application procedures, hiring, advancement, employee compensation, job training, and other terms, conditions, and privileges of employment have had the effect of discriminating against Plaintiffs on the basis of disability.

104.     Further, it is unlawful to use qualification standards or other selection criteria "that screen out or tend to screen out an individual with a disability" unless such standards are "shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6).  Roppe and Seneca have, through SCBDD supervising staff, violated this provision by using qualification standards that are neither job-related nor consistent with business necessity which have the effect of excluding Plaintiffs from accessing other essential functions of their jobs.

105.     Roppe's and Seneca's conduct has adversely affected Plaintiffs' opportunities and status because they are deprived of equal access to experience and skill development, compensation, advancement opportunities, and benefits based on erroneous assumptions about their disabilities.

106.     Roppe's and Seneca's conduct caused Plaintiffs substantial economic damages as measured by the difference between their actual rate of pay, pay-related benefits (or lack thereof), and the amounts earned and accrued by workers in similar manufacturing positions in the other divisions of Roppe.  Moreover, Roppe's and Seneca's conduct in placing an artificial cap at the Ohio minimum wage on Plaintiffs' wages is discriminatory and continues to cause

them economic damages now and into the future.  Plaintiffs are entitled to be paid prevailing wages for the job that they perform going forward.

107.    Because Roppe and Seneca are part of a single, integrated enterprise and/or are joint employers, Roppe and Seneca are jointly and severally liable for Plaintiffs' compensatory damages.  Because they acted with malice or with reckless indifference towards Plaintiffs and their rights under the ADA, they are also liable for punitive damages.  Finally, Roppe and Seneca are liable for the court costs, reasonable attorneys' fees, and expenses Plaintiffs have incurred in the prosecution of this matter.

## COUNT III

### <u>Violations of the Americans with Disabilities Act</u><br><u>Failure to Provide Reasonable Accommodations</u>

**(Against Roppe and Seneca)**

108.    Plaintiffs incorporate all of the foregoing allegations as if fully stated herein.

109.    Title I of the ADA prohibits an employer from failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]"  42 U.S.C. § 12112(b)(5)(A).  Moreover, an employer may not deny "employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee[.]"  42 U.S.C. § 12112(b)(5)(B).

110.    Roppe and Seneca, directly and/or through their agents and employees, have discriminated against Plaintiffs by:

• failing to perform an individualized assessment on each Plaintiff for all of the essential functions of their position in the Roppe Sampling Division even though they were otherwise qualified to perform them;

• failing to provide them with reasonable accommodations to perform the essential functions of the Roppe Sampling Division job that they currently perform, even though Plaintiffs' requests would not pose an undue hardship on Roppe and Seneca; and

• failing to provide Plaintiffs with reasonable accommodations on tasks that make up the essential functions of their job that they are otherwise qualified to perform but have been categorically prohibited from performing (e.g., failure to make machines accessible), even though Plaintiffs' requests would not pose an undue hardship on Roppe and Seneca.

111.   Roppe's and Seneca's conduct has adversely affected Plaintiffs' opportunities and status because they are deprived of equal access to experience and skill development, compensation, advancement opportunities, and benefits based on erroneous assumptions about their disabilities.

112.   Roppe's and Seneca's conduct has caused Plaintiffs substantial economic damages as measured by the difference between their actual rate of pay, pay-related benefits (or lack thereof), and the amounts earned and accrued by workers in similar manufacturing positions in the other divisions of Roppe.  Moreover, Roppe's and Seneca's conduct in placing an artificial cap at the Ohio minimum wage on Plaintiffs' wages is discriminatory and continues to cause them economic damages now and into the future.  Plaintiffs are entitled to be paid prevailing wages for the job that they perform going forward.  Plaintiffs are further entitled to

compensatory and punitive damages for Roppe's and Seneca's malicious and/or reckless disregard to their discriminatory employment practices.

113.     Because Roppe and Seneca are part of a single, integrated enterprise and/or are joint employers, Roppe and Seneca are jointly and severally liable for Plaintiffs' compensatory damages.  Because they acted with malice or with reckless indifference towards Plaintiffs and their rights under the ADA, they are also liable for punitive damages.  Finally, Roppe and Seneca are liable for the court costs, reasonable attorneys' fees, and expenses Plaintiffs have incurred in the prosecution of this matter.

## COUNT IV

### Violations of Ohio Rev. Code § 4112.02

**(Against Roppe and Seneca)**

114.     Plaintiffs incorporate all of the foregoing allegations as if fully stated herein.

115.     Ohio Rev. Code § 4112.02(A) prohibits employers from discriminating on the basis of disability "with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

116.     Roppe and Seneca have violated Ohio Rev. Code § 4112.02(A) by:

•     denying Plaintiffs equal access to job training opportunities across Roppe and also within the Sampling Division;

•     depriving Plaintiffs of access to, or an individualized assessment on, all of the essential functions of their position in the Roppe Sampling Division, even though they were otherwise qualified to perform them;

•     denying Plaintiffs an individualized assessment on positions at Roppe other than those in the Sampling Division on the basis of their disabilities;

- unlawfully segregating Plaintiffs by relegating Plaintiffs to Roppe's Sampling Division, a segregated division of the company with only employees with disabilities present except for SCBDD supervisory and Roppe support staff, without an adequate individualized inquiry into their skills and abilities and, instead, based only on general assumptions about the limitations imposed by their disabilities in a way that adversely affects their job status, employment opportunities within Roppe, and overall employment prospects in the open market;

- denying Plaintiffs compensation and pay equivalent to that received by non disabled employees working in other Roppe divisions;

- denying Plaintiffs other terms, conditions, and privileges of employment afforded to non-disabled employees in other Roppe divisions, including affording them opportunities for profit sharing, 401(k) plans, pension plans, health insurance, disability insurance, and equal vacation benefits; and

- denying Plaintiffs equal opportunities for advancement and promotional opportunities afforded to non-disabled employees performing similar work in other Roppe divisions; and

- denying Plaintiffs' requests for reasonable accommodations.

117.   Roppe's and Seneca's conduct has adversely affected Plaintiffs' opportunities and status because they are deprived of equal access to experience and skill development, compensation, advancement opportunities, and benefits based on erroneous assumptions about their disabilities.

118.   Roppe's and Seneca's conduct caused Plaintiffs substantial economic damages as measured by the difference between their actual rate of pay, pay-related benefits (or lack

thereof), and the amounts earned and accrued by workers in similar manufacturing positions in the other divisions of Roppe.  Moreover, Roppe's and Seneca's conduct in placing an artificial cap at the Ohio minimum wage on Plaintiffs' wages is discriminatory and continues to cause them economic damages now and into the future.  Plaintiffs are entitled to be paid prevailing wages for the job that they perform going forward.

119.     Because Roppe and Seneca are part of a single, integrated enterprise and/or are joint employers, Roppe and Seneca are jointly and severally liable for Plaintiffs' compensatory damages.  Because they acted with actual malice on account of their conscious disregard for Plaintiffs' rights under Ohio law, they are also liable for punitive damages.  Finally, Roppe and Seneca are liable for the court costs, reasonable attorneys' fees, and expenses Plaintiffs have incurred in the prosecution of this matter.

## COUNT V

## Violation of Ohio Rev. Code § 4112.02(J)

### (Against SCBDD)

120.     Plaintiffs incorporate all of the foregoing allegations as if fully stated herein.

121.     Ohio Rev. Code § 4112.02(J) prohibits one from, inter alia, aiding and abetting any act prohibited by § 4112.02 including "discriminat[ing] against [a] person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."  Ohio Rev. Code. § 4112.02(A).

122.     SCBDD has, through its agreement with Seneca and the direct actions of its staff, aided, abetted, and knowingly assisted Roppe's and Seneca's discriminatory conduct solely on the basis of disability by:

- hiring and assigning Plaintiffs to a segregated division of the company, Roppe's Sampling Division, without individually assessing Plaintiffs for other jobs within the company;

- failing to individually assess Plaintiffs;

- denying Plaintiffs reasonable accommodations; and

- prohibiting Plaintiffs from accessing equal opportunities for the development of skills and experience, compensation, opportunities for advancement, and benefits afforded to non-disabled workers in other Roppe divisions.

123.    SCBDD's conduct in aiding and abetting Roppe's and Seneca's discrimination caused Plaintiffs substantial economic damages as measured by the difference between their actual rate of pay, pay-rated benefits (or lack thereof), and the amounts earned and accrued by other, non-disabled workers in other Roppe divisions.  In addition, pursuant to Ohio Rev. Code § 4112.99, SCBDD is liable for the court costs, reasonable attorneys' fees, and expenses Plaintiffs have incurred in the prosecution of this matter.  Plaintiffs are further entitled to compensatory damages.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that Roppe and Seneca have violated the Americans with Disabilities Act, 42 U.S.C. § 12112, and Ohio Rev. Code § 4112.02, by denying Plaintiffs access to essential functions of their job, including opportunities to cross-train on all tasks in Roppe's Sampling Division, without an adequate individualized inquiry into their skills and abilities and what, if any, accommodations they need to perform those functions;

B.     Declare that Roppe and Seneca have violated the Americans with Disabilities Act, 42 U.S.C. § 12112, and Ohio Rev. Code § 4112.02, by denying Plaintiffs opportunities to be compensated at rates equal to other non-disabled workers in other Roppe divisions;

C.     Declare that Roppe and Seneca have violated the Americans with Disabilities Act, 42 U.S.C. § 12112, and Ohio Rev. Code § 4112.02, by denying Plaintiffs the same opportunities for advancement that are afforded to other non-disabled workers in other Roppe divisions;

D.     Declare that Roppe and Seneca have violated the Americans with Disabilities Act, 42 U.S.C. § 12112, and Ohio Rev. Code § 4112.02, by denying Plaintiffs the same benefits, such as vacation, retirement benefits, etc., as are afforded to other non-disabled workers in other Roppe divisions;

E.     Declare that Roppe and Seneca have violated the Americans with Disabilities Act, 42 U.S.C. § 12112, and Ohio Rev. Code § 4112.02, by unjustifiably limiting, segregating, and classifying Plaintiffs based on their disabilities in a way that adversely affects their job status and overall opportunities for employment;

F.     Declare that Roppe and Seneca have violated the Americans with Disabilities Act, 42 U.S.C. § 12112, and Ohio Rev. Code § 4112.02, by entering into a discriminatory arrangement or relationship that has the effect of subjecting Plaintiffs to discrimination based on their disabilities;

G.     Declare that Roppe and Seneca have violated the Americans with Disabilities Act, 42 U.S.C. § 12112(b)(5) and Ohio Rev. Code § 4112.02, by denying Plaintiffs' requests for reasonable accommodations;

H.     Declare that SCBDD violated Ohio Rev. Code § 4112.02(J) by aiding and abetting Roppe and Seneca's unlawful conduct;

34

I.      Enter a judgment against Roppe and Seneca, jointly and severally, in favor of Plaintiffs, based on Roppe's and Seneca's violations of the ADA and Ohio Rev. Code § 4112.02, in an amount equal to the difference between Plaintiffs' actual rate of pay, and pay-related benefits, and the amounts earned and accrued by other workers in other Roppe divisions, and for compensatory and punitive damages;

J.      Enter a judgment against SCBDD in favor of Plaintiffs based on SCBDD's violation of Ohio Rev. Code § 4112.02 in an amount equal to the difference between Plaintiffs' actual rate of pay, and pay-related benefits, and the amounts earned and accrued by other workers in other Roppe divisions, and for compensatory damages;

K.      Order that Plaintiffs be compensated at the prevailing wage for the job that they perform going forward;

L.      Award Plaintiffs pre- and post-judgment interest on all amounts owed as allowed by law, pursuant to 28 U.S.C. § 1961;

M.      Order Defendants to provide Plaintiffs with an individualized assessment on all essential functions of their Sampling Division Job;

N.      Order that if and when positions become available in other Roppe Divisions, Plaintiffs be afforded an opportunity to apply for and be individually assessed in such positions;

O.      Award Plaintiffs the reasonable attorneys' fees and costs incurred in prosecuting this action pursuant to 42 U.S.C. § 12117, 42 U.S.C. § 2000e-5(k), and Ohio Rev. Code § 4112.99;

P.      Grant Plaintiffs such other and further relief as the Court may deem just and proper.

                    Respectfully submitted,

s/Kerstin Sjoberg
Kerstin Sjoberg (0076405)
Trial Attorney
ksjoberg@disabilityrightsohio.org
William G. Puckett (0087603)
wpuckett@disabilityrightsoio.org
Disability Rights Ohio
200 Civic Center Dr., Ste. 300
Columbus, OH  43215
Telephone:  614-466-7264
Facsimile:  614-644-1888

Counsel for Plaintiffs

Regina Kline, *pro hac vice pending*
rkline@browngold.com
Kevin D. Docherty, *pro hac vice pending*
kdocherty@browngold.com
Anthony J. May, *pro hac vice pending*
amay@browngold.com
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, MD  21202
Telephone:  410-962-1030
Facsimile:  410-385-0869

Marc M. Maurer, *pro hac vice pending*
Attorney at Law
mmaurer@nfb.org
1800 Johnson Street
Baltimore, MD  21230
Telephone:  410-659-9317
Facsimile:  410-685-5653

Of Counsel