UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Pamela Steward, et al.,                  Case No. 3:18-cv-2905

        Plaintiffs

    v.                                       MEMORANDUM OPINION
                                                       AND ORDER

Roppe Corporation, et al.,

        Defendants

## I. INTRODUCTION

Before me is Plaintiffs' motion to amend the Complaint to add a claim under Title II of the Americans with Disabilities Act against Defendant Seneca County Board of Developmental Disabilities ("SCBDD"). (Doc. No. 61). SCBDD filed a brief in opposition to the amendment, (Doc. No. 64), and Plaintiffs replied. (Doc. No. 66).

## II. BACKGROUND

Defendant Roppe Corporation is a leading manufacturer of commercial flooring products with a facility in Fostoria, Ohio. At this facility, Defendant Seneca Re-Ad Industries, Inc. operates the Roppe Sampling Division. Seneca works exclusively for Roppe and employs only individuals with disabilities. Those individuals are supervised by employees of the SCBDD through an agreement between Seneca and SCBDD. Plaintiffs Pamela Steward, Ralph Magers, and Mark Felton are three of those individuals working for Seneca in the Roppe Sampling Division.

Plaintiffs brought this action against Roppe, Seneca, and SCBDD alleging discrimination under Title I of the ADA and Ohio discrimination law. Specifically, Plaintiffs alleged Roppe and Seneca violated state and federal discrimination laws by failing to individually assess Plaintiffs'

qualifications prior to relegating them to the Sampling Division, where they were paid less than, not provided the same benefits as, and denied the promotional opportunities available to non-disabled individuals employed at Roppe in other divisions. Beyond this, Plaintiffs claim the failure to individually assess each employee also plagues the Sampling Division in that they are assigned the same tasks daily based on stereotypical assumptions thus denying them the opportunity to cross-train and potentially increase their earnings. Finally, Plaintiffs claim they have been denied reasonable accommodations to perform the tasks they currently perform or are otherwise qualified to perform with a reasonable accommodation.

As to SCBDD in particular, Plaintiffs asserted only a discrimination claim under state law in the initial Complaint. (Doc. No. 1 at 32-33). Specifically, Plaintiffs alleged that through SCBDD's agreement with Seneca, SCBDD had aided and abetted in Roppe and Seneca's allegedly discriminatory conduct in violation of O.R.C. § 4112.02(J). Now, Plaintiffs seek to add a federal claim against SCBDD.

### III.  STANDARD

Rule 15 provides a party may amend its pleadings once as a matter of course within 21 days of serving the pleading or, if a responsive pleading is required, 21 days after service of a responsive pleading. Fed. R. Civ. Pro. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. Pro. 15(a)(2). "In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Head v. Jellico Hous. Auth.*, 870 F.2d 1117, 1123 (6th Cir. 1989).

But "when a plaintiff moves to amend the complaint after the deadline established by a scheduling order, the plaintiff first must show good cause under Rule 16(b) of the Federal Rules of Civil Procedure for failure earlier to seek leave to amend and the district court must evaluate prejudice to the nonmoving party before a court will even consider whether amendment is proper under Rule 15(a)." *Ross v. American Red Cross*, 567 F. App'x 296, 306 (6th Cir. 2014) (internal quotation marks and bracketed omitted); *see also Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003).

### IV. DISCUSSION

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Congress enacted this statute, in part, based on findings that "historically, society has tended to isolate and segregate individuals with disabilities." 42 U.S.C. § 12101(a)(2). Further, Congress noted that "individuals with disabilities continually encounter various forms of discrimination, including … segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. § 12101(a)(5).

Pursuant to Congress's direction, 42 U.S.C. 12134(a), the Attorney General promulgated regulations to implement Title II of the ADA. Among those regulations is the directive that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). In doing so, the "public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

Through this "integration mandate," States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 607 (1999). But Title II does not "impose[ ] on the States a 'standard of care' for whatever … services they render, or … require[ ] States to 'provide a certain level of benefits to individuals with disabilities.'" *Id.* at 603 n.14.

Plaintiffs allege SCBDD violated and continues to violate Title II's "integration mandate" by prioritizing funding for "sheltered employment" at Seneca rather than providing Plaintiffs with "supported employment services," which would allow them to work in "the most integrated setting appropriate" for their needs. (Doc. No. 61-2 at 26-27).

**A.  Rule 16**

Because the scheduling order in this case provided an August 1, 2019 deadline to amend the pleadings, (Doc. No. 24), Plaintiffs must first show good cause for failing to seek leave to amend earlier.[1] Plaintiffs allege good cause exists because of a delay in receiving voluminous written discovery and a mutually-agreed stay of discovery pending mediation. Plaintiffs claim they reviewed these documents only after mediation was unsuccessful and learned the following information, which incited them to move to amend the Complaint:

> Those documents reveal that the percentage of individuals SCBDD serves in sheltered employment has *increased* in the last decade. As of December 2009, an astonishing 86 percent of individuals SCBDD served in its Adult Services programs, (*i.e.*, 197 of 228 individuals) were working in sheltered employment. … By April

---

[1] Contrary to Plaintiffs' assertions in footnote one of their reply, (Doc. No. 66 at 2-3), my order required Plaintiffs to *move* to amend the Complaint by September 1, 2020. (Doc. No. 58). By ordering Plaintiffs to file a motion to amend by a date certain, I did not change the applicable standard and relieve them of the duty to show "good cause" for the fifteen-month delay in amending the Complaint by the deadline set in the scheduling order.

2019, that number climbed to 98 percent of the individuals SCBDD served (*i.e.*, 156 out of 159 individuals).

(Doc. No. 66 at 4).

Although it is true that these figures were confirmed by the Monthly Services Reports produced on December 6, 2019, these are not the facts alleged in the Proposed Amended Complaint. That is, Plaintiffs' Proposed Amended Complaint does not cite the increase in sheltered employment over time. Instead, in support of the ADA Title II claim, they allege: "the fact that 60 to 75 percent of the adults who qualify for SCBDD services only work in sheltered employment settings (with some of the other 25 to 40 percent working in community employment for as little as one hour per week)." (Doc. No. 61-2 at 13 & 28). These facts were learned as early as October 17, 2019, during the deposition of SCBDD Superintendent Lewis Hurst.

On October 17, 2019, Hurst testified that only "about 20 to 30 percent" of individuals working in the sheltered setting of the Roppe Sampling Division workshop transition or have transitioned to community employment. (Doc. No. 66-1 at 2). Further, he stated that of these "30 percent, there are folks that may get a couple hours out in the community and come back to the workshop and work part time here, part time there." (*Id.* at 3). Finally, he admitted that SCBDD "has defined community employment as one hour." (*Id.* at 4).

Because the Proposed Amended Complaint seeks to add facts learned on October 17, 2019, during the deposition of Hurst rather than those facts allegedly learned during the post-mediation document review in summer 2020, I am not persuaded that "good cause" exists for the extended delay. Even so, "'delay alone, regardless of its length is not enough to bar [the amendment] if the other party is not prejudiced.'" *Moore v. City of Paducah*, 790 F.2d 557, 560 (6th Cir. 1986) (quoting 3 Moore's Federal Practice, ¶ 15.08 at 15.76). Instead, "[t]o deny a motion to amend, a court must find 'at least some significant showing of prejudice to the opponent.'" *Ziegler v. Aukerman*, 512 F.3d 777, 786 (6th Cir. 2008) (quoting *Moore*, 790 F.2d at 562).

Here, SCBDD alleges it will suffer prejudice if the leave to amend is granted as extensive discovery has already been completed in this action.

In support of its argument, SCBDD first notes that, following the failed mediation, "Plaintiffs' attorneys proposed to 're-depose' certain witnesses and to take additional depositions" and contends that "if the proposed First Amended Complaint is filed, Plaintiffs will double down on their efforts to reopen depositions that were completed nearly a year ago, resulting in additional expense, and the potential for confusing testimony." (Doc. No. 64 at 14-15). Whether Plaintiff can re-depose witnesses and take additional depositions on the claims asserted in the original Complaint is entirely independent of the motion for leave to amend. And, in any case, whether that may occur is ultimately up to me regardless of Plaintiffs' efforts to "double down."

Aside from the additional discovery on existing claims, SCBDD contends they would suffer prejudice by having "to prepare a defense for the Title II claim, which could include securing additional expert witnesses to evaluate and provide opinions related to the utilization of sheltered workshops as appropriate employment options for disabled individuals." (Doc. No. 64 at 15). This argument is no more successful than the first. As stated by Plaintiffs, the need for a defendant to prepare a defense to a claim is a matter of course. As to SCBDD's concern regarding experts, the Defendants' current deadline for expert disclosure and reports is April 15, 2021. (Doc. No. 58).

Finally, SCBDD argues elsewhere in its brief that, at this point in the litigation, Plaintiffs' single claim currently asserted would fail as a matter of law on summary judgment and that, but for the amendment, they would be dismissed from this case. (Doc. No. 64 at 15-16). While this may be so, that question is not currently before me as SCBDD has not filed a motion for summary judgment.

Ultimately, while I agree Plaintiffs have not shown "good cause" to justify their lengthy delay in moving to amend the Complaint, I cannot conclude SCBDD would suffer any sort of "significant

prejudice" if leave to amend is granted. At this time, discovery is not yet completed and is not set to be completed in the immediate future. Additionally, dispositive motion practice has yet to commence or even be scheduled. As such, while I understand this late amendment is certainly an inconvenience, SCBDD has not carried its burden under Rule 16.

**B.     Rule 15(a)**

Aside from concerns of delay, SCBDD alleges amending the Complaint to add this claim would be futile. It also alleges that Plaintiffs filed this motion in bad faith. Because the majority of the allegations related to SCBDD's "bad faith" arguments relate directly to those of futility, I will address them together.[2]

Leave to amend should be denied as futile if the proposed amendment would not "withstand a Rule 12(b)(6) motion to dismiss." *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 421 (6th Cir. 2000). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly* 550 U.S. 544, 570 (2007)). That is, while the *factual* allegations, taken as true, need not be detailed, they "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

---

[2] The single outstanding argument of "bad faith" relates to SCBDD's allegations that Plaintiffs filed this motion after the failed mediation "to retain a party to the lawsuit which will otherwise be dismissed on summary judgment, for the improper purposes of preserving another financial pocket from which damages or attorney fees might be paid, or to assure that the entity with whom Plaintiffs have an on-going relationship can be made subject to whatever non-economic injunctive remedies Plaintiffs seek to impose." (Doc. No. 64 at 15). First, SCBDD has not been dismissed from this litigation or even moved for summary judgment. Second, even if SCBDD was granted summary judgment on the existing Ohio law claim, it would have to open its "financial pocket" or "be made subject to … non-economic injunctive remedies" only if it is found to have violated Title II of the ADA or if it decides to settle that claim rather than engage in dispositive motion practice. In any event, I find this argument to be, in SCBDD's own words, "bogus." (*Id.* at 16).

Since the time the briefing was completed, the Sixth Circuit acknowledged "that plaintiffs can state a claim for violation of the integration mandate by showing that they have been placed at serious risk of institutionalization or segregation." *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, -- F.3d --, 2020 WL 6336313, at *21-*22 (6th Cir. Oct. 29, 2020). In doing so, the Circuit looked to the Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.*[3] and stated that, "[e]ven if not authoritative, the DOJ's 'views warrant respect' in this area." *Id.* at *21 (quoting *Olmstead*, 527 U.S. at 597-98).

In this Statement cited by the Circuit in *Waskul*, the DOJ stated, "a public entity may violate the ADA's integration mandate when it … through its planning, service system design, funding choices, or service implementation practices, promotes or relies upon the segregation of individuals with disabilities in private facilities or programs." It went on to define "[a]n *Olmstead* plan [a]s a public entity's plan for implementing its obligation to provide individuals with disabilities opportunities to live, work, and be served in integrated settings." When discussing the *Olmstead* plan, the DOJ spoke of "sheltered workshops" like the Roppe Sampling Division. Specifically, the DOJ stated, "The plan should include commitments for each group of persons who are unnecessarily segregated, such as … individuals spending their days in sheltered workshops or segregated day programs."

Beyond this statement alone, the DOJ has participated in at least three lawsuits brought against states whose employment services relied on sheltered employment over supported and integrated employment.[4]

---

[3] Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.*, U.S. Dep't of Justice Civil Rights Division, https://www.ada.gov/olmstead/q&a_olmstead.htm.

[4] *Olmstead* Enforcement, ADA.gov, U.S. Dep't of Justice Civil Rights Division, https://www.ada.gov/olmstead/olmstead_cases_list2.htm#ri-state (last visited Nov. 2, 2020)

8

In one of these cases, the plaintiffs made similar allegations to those presented here: "defendants are violating the antidiscrimination laws by dedicating a disproportionate amount of their resources to fund sheltered workshops at the expense of supported employment services." *Lane v. Kitzhaber*, 841 F. Supp. 2d 1199, 1206 (D. Or. 2012).[5] Based upon *Olmstead*, the *Lane* court held that "a claim survives only if it truly alleges a 'discriminatory denial of services' and must be dismissed if it instead concerns the 'adequacy' of the services provided." *Id.* at 1207. In so holding, the court noted that allegations "that defendants [were] violating Title II of the ADA … by failing 'to offer an *adequate array* of integrated employment and supported employment services' … and 'to provide them with supporting employment services that *would enable them to work in integrated employment settings*' … [were] subject to dismissal because they demand[ed] that defendants provide a competitive job in the community and a certain standard of care or level of benefits." *Id.* at 1208.[6]

In the *Lane* First Amended Complaint, each of the named plaintiffs stated specific facts regarding their desire and qualifications for integrated employment, which was expressed and known to the defendants, who denied them of supported employment services that would assist the plaintiffs in pursuing their employment goals. (*See* First Amended Complaint at ¶¶ 112-176, *Lane v. Kitzhaber*, No. 3:12-cv-00138, 2012 WL 2282365 (D. Or. May 29, 2012)).

---

(discussing settlements reached in the following cases involving unnecessary segregation in sheltered workshops: *United States v. Rhode Island*, No. 1:14-cv-00175 (D.R.I. 2014); *United States v. Rhode Island & City of Providence*, No. 1:13-cv-00442 (D.R.I. 2013); and *Lane v. Brown* (formerly *Lane v. Kitzhaber*, No. 12-cv-00138 (D. Or. 2012)).

[5] SCBDD alleges it "is unacceptable and apparent bad faith, … to import *Lane* and use it against a local board of developmental disabilities." (Doc. No. 64 at 16). Bu there is no dispute that both the state of Oregon sued in *Lane* and SCBDD sued here are both "public entities" and are thus both subject to Title II of the ADA. SCBDD appears to equate its opinion that Plaintiffs' claim is meritless with a finding of "bad faith." I disagree.

[6] Plaintiffs do seek "an adequate array of integrated employment services and supported employment services," (Doc. No. 61-2 at 41), which was deemed a "forbidden remedy" by *Lane*. 841 F. Supp. 2d at 1208. But this is not "bad faith" per se.

Unlike the *Lane* First Amended Complaint, the facts in the Proposed Amended Complaint are sparse. For example, the Proposed Amended Complaint alleges:

> [SCBDD] has failed to provide the individuals it serves (including Plaintiffs) with individualized supported employment services that would enable them to: (a) learn about opportunities for competitive integrated employment, including opportunities at Roppe beyond the Sampling Division; (b) make meaningful choices about whether or not to seek other competitive integrated employment opportunities; and (c) help them acquire additional vocational skills and opportunities to work alongside non-disabled peers in competitive integrated employment settings.

(Doc. No. 61-2 at 28). But the Proposed Amended Complaint fails to state any facts to support the conclusory allegation that SCBDD failed to advise Plaintiffs of opportunities for competitive integrated employment that would allow them to make meaningful choices about whether or not to seek competitive employment.[7]

The only specific facts alleged in support of this claim relate to the third assertion: that SCBDD did not help them acquire additional vocational skills and opportunities to work alongside non-disabled peers in competitive integrated employment settings. The facts in support of this include Plaintiffs' claim that SCBDD purports to offer the service of cross-training Seneca workers "in all tasks that make up the Sampling Division." (Doc. No. 61-2 at 14). But Plaintiffs claim that, despite numerous requests, SCBDD supervising staff has "denied [Plaintiffs] access to tasks within the division that are essential parts of the sample assembly job based on stereotypical assumptions about their capabilities and outright refusals to provide them with reasonable accommodations." (*Id.* at 14-15). Plaintiffs claim this denial of the cross-training service has deprived them of the opportunity to acquire additional vocational skills, which could assist them in integrated employment settings. (*Id.* at 16).

---

[7] Without making a specific finding of "bad faith," I note with disapproval Plaintiffs' decision to make these conclusory allegations in the Proposed Amended Complaint, especially in the face of discovery indicating Plaintiffs were informed of and offered alternate vocational training but declined those opportunities.

Taking these facts as true, Plaintiffs have plausibly stated that SCBDD, through its staff working at Seneca, has denied them of the cross-training services for which they are qualified because of their disability. Therefore, amending the Complaint to add subpart (c) of their Title II claim related to the alleged discriminatory denial of cross-training services by SCBDD supervising staff at Seneca is not futile. But because the Proposed Amended Complaint does not allege facts sufficient to support Plaintiffs' broader challenge to SCBDD's "employment service system," amending the Complaint to add those allegations would be futile.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' motion to amend the Complaint is granted in part, and denied in part. Plaintiffs may add a claim under Title II of the ADA, but that claim must be limited in scope as discussed above. Plaintiffs shall file this Amended Complaint by November 30, 2020.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge