UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Pamela Steward, *et al.*,                                          Case No. 3:18-cv-2905

        Plaintiffs,

    v.                                                       MEMORANDUM OPINION
                                           AND ORDER

Roppe Corporation, *et al.*,

        Defendants.

## I.    INTRODUCTION

In this discovery dispute, Plaintiffs seek production of all emails sent and received from Gmail accounts belonging to Rodney Biggert and Michelle Ickes.  Defendants Seneca Re-Ad Industries, Inc. and Seneca County Board of Developmental Disabilities move to protect some of these emails from production on grounds of attorney-client privilege.  (Doc. Nos. 81 & 82). Plaintiff filed an omnibus opposition brief to Defendants' motions, (Doc. No. 94), and Defendants each filed reply briefs.  (Doc. No. 95 & 96).

## II.    BACKGROUND

The Seneca County Board of Developmental Disabilities ("SCBDD") is charged with providing services to meet the needs of Seneca County residents who are individuals with developmental disabilities.  *See* Ohio Rev. Code §§ 5126.04(A), 5126.05(A).  To do so, the SCBDD "may enter into contracts with other such boards and with public or private, nonprofit, or profit-

making agencies or organizations."  Ohio Rev. Code § 5126.05(C).  The SCBDD entered into one

such contract with not-for-profit corporation Seneca Re-Ad Industries, Inc.  (Doc. No. 18-1). [1]

Pursuant to the Contract for Vocational Services between the SCBDD and Seneca Re-Ad,

Seneca Re-Ad agreed to operate a sheltered workshop, employing only individuals with disabilities.

But these Seneca Re-Ad employees were to be supervised on-site by employees of the SCBDD.  The

contract provided that the SCBDD Director of Adult Services serve as the liaison between Seneca

Re-Ad and the SCBDD and assist Seneca Re-Ad in the implementation of the contract.  (Doc. No.

18-1 at 2, 13).  During the relevant time period, Rodney Biggert was the SCBDD Director of Adult

Services.

## A.      Department of Labor Proceedings

Plaintiffs Pamela Steward, Ralph Magers, and Mark Felton are SCBDD clients employed by

Seneca Re-Ad.  In November 2015, Plaintiffs, through Disability Rights Ohio ("DRO"), filed a

Petition for a Review of Wages with the Department of Labor, asserting Seneca Re-Ad was

unlawfully paying them subminimum wages.  (No. 3:17-cv-2119, Doc. No. 1-1).  Even though the

Petition was filed against Seneca Re-Ad, DRO sent a letter and a copy of the Petition to Biggert and

SCBDD Superintendent Lewis Hurst.  (Doc. No. 82-1 at 1-2).

After receiving the Petition, Hurst encouraged the Seneca Re-Ad Board of Directors to

employ Stephen Postalakis and his firm, Haynes, Kessler, Myers & Postalakis, Inc.  ("HKMP").  (*Id.*

at 3).  He did so because HKMP "practice[d] in the area of employment law, and [is] recognized

across the state as having special expertise in matters involving County Boards of Developmental

---

[1] This exhibit contains two contracts governing the relationship between SCBDD and Seneca Re-Ad.  The first is titled "Seneca County Board of Developmental Disabilities and Seneca Re-Ad Industries Non-Profit Board November 2, 2016 Month to Month Agreement."  (Doc. No. 18-1 at 12-14).  The second is titled "Contract for Vocational Services, was dated July 1, 2018, and executed by all parties by September 11, 2018.  (*Id.* at 1-11).  For purposes of this motion, I will presume the November 2016 contract was in effect at the time the Department of Labor proceedings were initiated in 2015 through September 11, 2018.

Disabilities." (*Id.* at 2). Hurst also attests HKMP "engaged directly" with the SCBDD in the past by representing the SCBDD at the State Personnel Board of Review and "answer[ing] numerous employment questions" for the SCBDD. (*Id.*).

The Seneca Re-Ad Board of Directors acted on Hurst's recommendation and hired HKMP to represent it in the DOL proceedings.

The SCBDD was not a party to the DOL proceedings. But, as stated by Hurst, "I recognized that because SCBDD employees provide liaison, supervisory and business management services pursuant to the [Contract for Vocational Services between SCBDD and Seneca Re-Ad], those employees would be witnesses in the proceedings." (*Id.* at 3). Specifically, Hurst stated,

> SCBDD employees, including Mr. Biggert, carry out various functions on behalf of Seneca Re-Ad, which were relevant to the Section 14(c) proceedings. For example, SCBDD employees prepared the application for the Section 14(c) certificate; conducted prevailing wage rate reviews; trained the employees with disabilities of Seneca Re-Ad on various tasks at Seneca Re-Ad's workshop; established standards of production through time studies and hourly sampling reports for the tasks performed at Seneca Re-Ad's workshop; and tested the productivity of the employees with disabilities. Even though the Board had an interest in the DOL administrative proceeding due to its contract with Seneca Re-Ad, I felt that the Board also had an interest in the DOL administrative proceeding because the actions of its employees were at issue in the matter. As a result, I felt that the Board's employees needed to be represented in the course of defending Seneca Re-Ad in the DOL administrative proceeding.

(*Id.* at 3-4).

Hurst and Postalakis allege the SCBDD's interest in the DOL proceedings aligned with Seneca Re-Ad's interest and, because of that "common interest," the SCBDD and Seneca Re-Ad agreed to jointly defend against the Petition. (*Id.* at 2-3; Doc. No. 82-9 at 2). Although Hurst and Postalakis allege this agreement was documented by the Joint Defense and Reciprocal Privilege Agreement (the "Agreement"), (Doc. No. 82-3), no executed copy of this Agreement could be located and there is a possibility that it was never executed. (Doc. No. 82-1 at 2-3; Doc. No. 82-9 at 2-3). Still, each state the Agreement accurately reflects the intent and understanding of the SCBDD

and Seneca Re-Ad, (*id.*): that SCBDD and Seneca Re-Ad "wish to jointly defend the Petition" because their "relationship is such that the [SCBDD]'s employees are involved in the business of the [Seneca Re-Ad] and have substantial knowledge regarding the facts and claims arising under the Petition." (Doc. No. 82-3 at 1).

The Agreement named the SCBDD and Seneca Re-Ad as "Clients." (*Id.*).  As collective "Counsel," it named Postalakis, David S. Kessler, Esq., and HKMP's predecessor firm, Blaugrund Kessler Myers & Postalakis, Incorporated,[2] and Franklin J. Hickman, Esq. and Hickman & Lowder, L.P.A.  (*Id.*).  It does not specify which attorney or attorneys represented which client.

Hurst now attests his "goal at the start of the DOL proceedings was to have Mr. Postalakis and Mr. Kessler, and their Firm, represent the SCBDD's employees." (Doc. No. 82-1 at 4).  But there is no objective evidence showing the SCBDD engaged HKMP's services for representation in the administrative proceedings.  Instead, in an email sent on November 19, 2015, Hurst stated the SCBDD "consulted with Frank Hickman for representation if needed" in the Department of Labor Proceedings.  (Doc. No. 94-23 at 2).  After the first decision by the Department of Labor on February 2, 2016, Hurst sent the following,

> I am forwarding the judgement of the hearing regarding Seneca Re-[Ad].  Currently, Frank Hickman is reviewing and will advise us how to [proceed].
>
> In summary the Judge ordered that the individuals be paid minimum wages for the last three years plus liquated damages plus attorneys fees.  The approximate cost is $57,000 .  They will pay out of their reserves.
>
> We will need . . . to determine how to proceed with Seneca Re[-A]d[].  I will be seeing if we can schedule Frank Hickman to attend our next board meeting.

---

[2] In his affidavit, Postalakis identified David Blaugrund as "the founder and former partner of the firm." (Doc. No. 82-9 at 2).  A January 31, 2018 Letter from Postalakis is written on letterhead with the previous firm name.  (Doc. No. 82-12).  But an April 2019 email from Hurst identified "the law firm of Haynes Kessler Myers & Postalakis, Incorporated (formerly known as Blaugrund Kessler Myers & Postalakis, Incorporated)."  (Doc. No. 94-29 at 2).  Based on this evidence, it appears that, for all intents and purposes, the only thing that changed about the firm was the name.  Although it is unclear when name was changed, the timeline is irrelevant to the analysis.

(Doc. No. 95-25 at 25).

The January 2016 SCBDD Minutes show the SCBDD already agreed to "invite[ Hickman] to the February meeting to discuss the recent federal hearing."  (Doc. No. 94-24 at 4).

**B.      Events Resulting in this Litigation**

While the Department of Labor proceedings were still pending, Plaintiffs allege that "[b]eginning in August 2017, [they], through a series of written requests sent by their attorneys [at DRO], requested that they be individually assessed [with the assistance of a job coach] on each task in the Roppe Sampling Division to determine whether they could perform [or be trained to perform] each task with or without reasonable accommodations."  (Doc. No. 72 at 20).  Plaintiffs claim DRO sent a series of these requests to Seneca Re-Ad between August 25, 2017 and March 5, 2018, and that Seneca Re-Ad responded to these requests through counsel – Kessler and Postalakis of HKMP. (*Id.* at 22; Doc. No. 94-4 at 2 (naming the HKMP attorneys "handling this matter")).

On November 8, 2017, DRO sent a letter to Postalakis related to Plaintiffs' requests and expressing its concern that Seneca Re-Ad had "used third parties to solicit information from our clients in anticipation of potential litigation regarding these matters."  (Doc. No. 94-3 at 2).  DRO formed this belief through statements made by Postalakis in letters and emails to DRO, which showed someone acting on behalf of Seneca Re-Ad had contacted Plaintiffs' "Service and Support Administrators (SSAs) to obtain information from [Plaintiffs] regarding the matters that are the subject of the interactive process."  (*Id.*).  DRO requested Seneca Re-Ad "cease any and all such attempts to contact our clients via their SSAs immediately," (*id.* at 3), explaining,

> [t]hese communications are inappropriate both because: ( 1 ) our clients are
> represented parties; and (2) our clients have the right to maintain confidential
> communications with their SSAs, who serve a vital role coordinating services funded
> via the Seneca County Board of Developmental Disabilities ("the County Board").

(*Id.* at 2).

On the same date, DRO also sent a letter to Hickman in his capacity as the attorney of the

SCBDD.  (Doc. No. 94-4).  In this letter, DRO notified Hickman of the situation.  DRO then

stated,

> we ask that you communicate to your client that they should not under any
> circumstances communicate with our clients at the direction of Blaugrund Haynes
> Kessler Myers & Postalakis, Incorporated, nor should they share our clients'
> confidential information with Blaugrund Haynes Kessler Myers & Postalakis,
> Incorporated.  In addition, if an employee of Seneca Re-Ad asks your client to
> inquire about matters related to reasonable accommodations such as the need for a
> job coach, specific training, or other requests, be aware that these requests are the
> subject of the ongoing negotiations between our clients and Seneca Re-[A]d's
> counsel.

(*Id.* at 2-3).

Seemingly in accordance with DRO's request, on December 4, 2017, Hickman notified

DRO that Felton had scheduled his annual Individual Service Plan ("ISP") meeting with his SSA for

December 6, 2017.  (Doc. No. 94-6 at 5).  He stated, "Let me know if you want to attend; if you are

there I will be there as well."  (*Id.*).  DRO declined the invitation because it did not "see any reason

for the SSA's to discuss [issues related to the current litigation or interactive process with Seneca Re-

Ad] with our clients at their annual ISP meetings."  (*Id.* at 4).  Therefore, DRO felt its presence was

not necessary at this meeting and could potentially disrupt the relationship between Felton and his

SSA.  (*Id.*).

Still, DRO stated, "if you or your client anticipates that issues related to the current litigation

or interactive process with Seneca Re-Ad will be discussed at the annual ISP meetings,

this may change."  (*Id.*).  Hickman responded that he did not "anticipate that the SSA will be talking

about any litigation-related matters," and advised, "If interaction issues should persist, I suggest that

we have a meeting with administration and counsel to ensure that everyone is clear about current

procedures and parameters for communication."  (*Id.* at 3).

Following the meeting between Felton and his SSA, DRO emailed Hickman regarding its concern that, "it seem[ed] that the SSA asked Mr. Felton several questions that overlap with matters that are either currently being litigated or are subject to the interactive process between our clients and Seneca Re-Ad." (*Id.* at 2). DRO then requested "that the Seneca County Board refrain from sharing any records or other information regarding the SSA's discussions with our clients on these topics with Seneca Re-Ad or their counsel unless the Board first obtains our clients' express written consent to do so, and we ask that you contact us to obtain this consent." (*Id.* at 3). Hickman confirmed he would "convey [DRO's] request that information received in response to these questions not be forward to Seneca Re-Ad or Counsel without express written consent through [DRO]." (*Id.* at 2).

On December 12, 2017, Hickman sent DRO an email "confirm[ing] our discussion today." (Doc. No. 94-17 at 3). According to Hickman, the topics discussed included:

2. With respect to communication issues between the DD Board and Seneca Re-Ad staff:
   a. the Seneca County DD Board employs all staff who provide vocational and habilitation services to the workers being paid through Seneca Re-Ad.
   b. Rodney is employed by the DD Board as the adult services director and, in that capacity, reviews and approves all ISPs.
   c. DD Board employees who provide workshop supervision and habilitation services are part of the ISP team.
   d. Seneca Re-Ad consists of the board members, a single bus driver and the individuals with disabilities who work on the various tasks.

   Given these facts, it is not feasible to prohibit communication between the SSAs and the Re-Ad Board staff.

3. I agree that no communication should occur between DD Board staff and counsel for Seneca Re-Ad without formal written permission or other legal process such as discovery.

(*Id.*).

On December 18, 2017, DRO sent Postalakis and Kessler a letter stating its understanding that the two had been communicating with Biggert and other SCBDD employees regarding this

action, the Department of Labor proceedings, and another civil action Plaintiffs had filed against

Seneca Re-Ad related to the wage claim raised in those administrative proceedings.  (Doc. No. 94-8).

DRO asserted those communications were not protected by the attorney-client privilege because

those individuals were employed by the SCBDD, not Seneca Re-Ad, and because Postalakis and

Kessler represented Seneca Re-Ad, not the SCBDD.  Therefore, DRO "request[ed] certain

documents, ESI information, and/or any other information relating to your communications with

representatives of the County Board."  (*Id.* at 2).

Postalakis responded to this email on January 31, 2018, stating that he represented both

SCBDD and Seneca Re-Ad.  (Doc. No. 92-12).  He also stated,

> We are aware that in December you received an email communication from Frank
> Hickman wherein he opined that counsel for Seneca Re-Ad should not communicate
> with County Board staff concerning your clients without written permission or by
> way of the discovery process.  However, at the time of that communication Frank
> was not fully aware of the relevant facts, specifically that our firm has a long-standing
> attorney-client relationship with the County Board, and an appropriate business
> associate agreement, a copy of which is attached.  We have discussed this matter with
> Frank and he now agrees that there is nothing inappropriate about our firm
> investigating your clients' requests for services and responding to your several letters
> about that topic.  Hickman & Lowder Co. L.P.A. also represents the County Board
> and will continue to do so.

(Doc. No. 82-4 at 1).

Following this, Hickman responded to Plaintiffs' public records request to the SCBDD.  (Doc. No.

82-5).  There, he responded, "See privilege log," to the request for communications between Biggert

and attorneys for Seneca Re-Ad related to Plaintiffs.  (*Id.* at 2).

Ultimately, Plaintiffs and Seneca Re-Ad were not able to resolve the issues related to

Plaintiffs' requests.  Because of this, Plaintiff filed this action on December 18, 2018, asserting

claims against the SCBDD, Seneca Re-Ad, and Defendant Roppe Corporation under the Americans

with Disabilities Act and Ohio disability discrimination law.

### C.    Emails at Issue

On or around October 13, 2017, Biggert created the two Google Mail accounts at issue here: one for himself and the other for his subordinate, Michelle Ickes, who acted as the Business Manager of the Seneca Re-Ad workshop.  Because both Biggert and Ickes were SCBDD employees, each maintained official County email addresses.  But Biggert created the additional Google Mail accounts and advised the Seneca Re-Ad board members to direct "all future Seneca Re-Ad business to this address" because:

> DRO [Disability Rights Ohio] did a public records request of the county board for all contract between Re-Ad and the Seneca County Board, and all County Board meeting minutes for anything regarding the petition, how individuals are paid, or Seneca Re-Ads in general.  As I am a public employee any email that leaves my server is a public record and while DRO has not requested my emails at this time[,] [t]hey could still make a public records request of my emails and have access to things we have talked about regarding the hearing.  Items that we have talked to with Steve via email would be protected through Attorney Client Privilege, but items that we have talked about via email among ourselves would not.  Using this email will keep these communications from being public records and therefore would not be able to be requested.

(Doc. No. 94-12 at 2).

He explained the new email for Ickes was created to shield Seneca Re-Ad's financials from a public record request.

Plaintiffs now request all emails sent and received from those two email addresses.  Most of the emails from these accounts have or will be produced, but Defendants seek a protective order against the production of certain emails on grounds of relevance and attorney-client privilege – specifically, correspondence between the subject accounts and attorneys affiliated with Seneca Re-Ad's counsel of record, HKMP.

### III.    STANDARD

In this action, Plaintiffs assert claims under the Americans with Disabilities Act and pendent claims under Ohio disability discrimination law.  "The Sixth Circuit has held that questions of

privilege that arise in federal question cases in which pendent state law claims are also raised should be governed by the federal common law of privileges." *Hilton-Rorar v. State & Federal Commc'ns Inc.*, No. 5:09-cv-01004, 2010 WL 1486916, at *6 (N.D. Ohio Apr. 13, 2010) (citing Fed. R. Evid. 501 & *Hancock v. Dodson*, 958 F.2d 1367, 1372-73 (6th Cir. 1992)).  Therefore, federal common law of attorney-client privilege governs here.

Under federal common law, attorney-client privilege applies: "(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived." *Reed v. Baxter*, 134 F.3d 351, 355-56 (6th Cir. 1998).  "The burden of establishing the existence of the privilege rests with the person asserting it." *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999).

"While the purpose of the attorney-client privilege is to encourage clients to communicate freely with their attorneys, the privilege is narrowly construed because it reduces the amount of information discoverable during the course of a lawsuit." *United States v. Collis*, 128 F.3d 313, 320 (6th Cir. 1997).  Therefore, "[t]he privilege 'applies only where necessary to achieve its purpose and protects only those communications necessary to obtain legal advice.'" *In re Columbia/HCA Healthcare Corp. Billing Pracs. Litig.*, 293 F.3d 289, 294 (6th Cir. 2002) (quoting *In re Antitrust Grand Jury*, 805 F.2d 155, 162 (6th Cir. 1986)) (further citation omitted).  Generally, "[t]he attorney-client privilege is waived by voluntary disclosure of private communications by an individual or corporation to third parties." *Dakota*, 197 F.3d at 825.

## IV.    DISCUSSION

Although the SCBDD and Seneca Re-Ad both seek a protective order for the disputed Gmail emails, only SCBDD submitted an up-to-date privilege log.[3] (Doc. No. 94-17). But the SCBDD's privilege log includes only those messages on the SCBDD server. That is, the privilege log does not list *all* of the emails for which protection is sought by the SCBDD and Seneca Re-Ad, but instead states only those allegedly privileged Gmail communications "received or sent by individuals through the SCBDD computer system." (Doc. No. 81 at 8). Based on the SCBDD's representations, the remaining disputed emails are in the possession and control of Seneca Re-Ad.

Seneca Re-Ad does not dispute that it has possession of those emails but maintains it is not required to produce a privilege log under the terms of the ESI Stipulation. (Doc. No. 82 at 7; Doc. No. 95, n.1). The ESI Stipulation states, "the Parties agree that privileged communications between attorneys and legal staff and their respective clients need not be included on a privilege log, but must be preserved if relevant to any legal claims and defenses raised in this action." (Doc. No. 40 at 6). That is, under the terms of the ESI Stipulation, no privilege log must be produced for privileged communications between attorneys and "their respective clients."

Because there are disputes as to whether the emails at issue are "privileged communications" and whether the SCBDD is or was a "respective client" of HKMP, these communications do not fall squarely within the scope of the communications contemplated. As such, the ESI Stipulation

---

[3] Seneca Re-Ad attached a privilege log that was previously submitted to Plaintiffs in response to a public records request on February 27, 2018. (Doc. No. 82-1 at 5; Doc. No. 82-6). This log lists email communications exchanged by Biggert and Postalakis between December 2015 and October 20, 2017. (Doc. No. 82-6). But it does not specify that those communications were sent and received by Biggert's Gmail account, which was only created on or around October 13, 2017. Though there are three emails listed on the log that were sent and received during the time the Gmail account existed, the SCBDD privilege log shows these three emails are not the only messages in dispute now. Therefore, it can be inferred that this is not a full list of those communications for which protection is sought.

does not shield the communications between HKMP and these Gmail addresses from inclusion on the privilege log.  Should Seneca Re-Ad wish to pursue this claim of privilege, it shall produce a log of all emails for which it seeks protection on those grounds.

Denying blanket protection for all emails involving HKMP, I now turn to those stated on the SCBDD privilege log.[4]  (Doc. No. 94-17).  From what I can discern, the communications listed in this log fall into at least three groups.  The first group consists of communications between representatives of the SCBDD and HKMP.[5]  The second, those between representatives of the SCBDD, HKMP, and Seneca Re-Ad.[6]  And the third, those between representatives of the SCBDD, HKMP, Seneca Re-Ad, and additional parties.[7]

---

[4] I reject the SCBDD's argument raised for the first time in its reply brief that the descriptions stated in the privilege log show emails in its possession are not discoverable because they are not relevant to the parties' claims or defenses.  (Doc. No. 96 at 2-3).  First, a reply brief is not an acceptable vehicle by which to raise a new argument.  And second, I disagree with the argument on the merits. Many of the emails at issue are described as discussing "County board/Re-Ads meeting."  (Doc. No. 94-17 at 4-5).  These communications would go directly to whether the SCBDD "aided or abetted" Seneca Re-Ad's allegedly discriminatory conduct.  Further, those related to the "lawsuit" also may be relevant to the claims and defenses raised in this "lawsuit." (*Id.* at 2-3).  Finally, while I agree that those emails related to HKMP invoices may not be relevant to the claims and defenses here, the SCBDD has not introduced these documents as evidence to show an attorney-client relationship existed between HKMP and the SCBDD.

[5] *E.g.*, The December 19, 2018 exchange involving Postalakis (HKMP), Biggert (SCBDD), and Hurst (SCBDD).  (Doc. No. 94-17 at 3).

[6] *E.g.*, The November 2018 exchange involving Jennifer Jones (HKMP), Biggert (SCBDD), Ickes (SCBDD), and Thomas Smith (Seneca Re-Ad Board President, (*See* Doc. No. 1-1 (Smith signed as Seneca Re-Ad Board President)).  (Doc. No. 94-17 at 3).

[7] *E.g.*, The March 18, 2018 email authored by Brian Cooper (deposed as the "designee of Roppe Corporation," (Doc. No. 84-1 at 10)), and received by Smith (Seneca Re-Ad), Biggert (SCBDD), Postalakis (HKMP), Hurst (SCBDD), Galen Dillon, Janice Colman, and mknye1992@yahoo.com. (Doc. No. 947-17) at 4).  The identity of the person associated with the Yahoo.com email address is unclear.  It is also not immediately apparent how Dillon and Colman are related to the parties here. While an email exchange suggests the three may have been Seneca Re-Ad Board members, the same exchange shows Dillon possesses a "@roppe.com" email address.  (Doc. No. 94-26).

Based on the briefing, the SCBDD and Seneca Re-Ad apparently seek protection only as to those emails in the first and second groups. That is, Seneca Re-Ad and the SCBDD argue an attorney-client relationship existed between the SCBDD and HKMP such that communications between the two should be protected. Construing the briefing liberally, the SCBDD and Seneca Re-Ad also make an argument that they should be considered joint clients of HKMP such that any attorney-client privilege would not be waived by voluntary disclosure of the communication to the other.

But no argument has been made with respect to those communications involving additional parties. Therefore, any attorney-client privilege which would otherwise apply to communications in the third group is deemed waived by disclosure of those communications to third parties.

## A.      Communications between SCBDD and HKMP

The Sixth Circuit has recognized that "a municipality can assert the attorney-client privilege in civil proceedings." *Ross v. City of Memphis*, 423 F.3d 596, 603 (6th Cir. 2005). Further, "generally in conversations between municipal officials and the municipality's counsel, the municipality, not any individual officers, is the client." *Id.* at 605.

"In determining whether an attorney-client relationship has been created, the focus is on the putative client's subjective belief that he is consulting a lawyer in his professional capacity, and on his intent to seek professional legal advice." *Dalrymple v. Nat'l Bank & Trust Co. of Traverse City*, 615 F. Supp. 979, 982 (W.D. Mich. 1985) (quoted by *Grace v. Ctr. for Auto Safety*, 72 F.3d 1236, 1242 (6th Cir. 1996)). The relationship may be either implied or expressed in a contract. *Id.* at 986. "An implied attorney-client relationship exists whenever the lay party submits confidential information to an attorney whom he reasonably believes is acting to further his interests." *Id.* (citing cases). "[T]he formation of an attorney-client relationship is not dependent on the payment of fees." *Grace*, 72 F.3d at 1241-42 (citations omitted).

The SCBDD alleges, "HKMP has represented SCBDD before the DOL proceedings began, during those proceedings, during the ramp up to the present lawsuit, during these proceedings, and in an on-going capacity." (Doc. No. 81 at 6). Plaintiffs apparently do not dispute that an attorney-client relationship existed between the SCBDD and HKMP after April 4, 2019, when Seneca County Prosecutor Derek DeVine confirmed his approval for the SCBDD to use HKMP to represent it in matters involving Plaintiffs. (Doc. No. 94 at 24-25, 27 (citing Doc. No. 94-29)). Therefore, the issue is whether an attorney-client relationship existed between the time the email addresses were created in October 2017 and the time approval was given in April 2019.

There is objective evidence showing HKMP represented the SCBDD in some capacity prior to and during this time period. For example, the SCBDD approved a resolution on April 12, 2016, "resolv[ing] to retain attorney Steve Postalakis to represent the SCBDD with the State Personnel Board of Review." (Doc. No. 94-1 at 84). Additionally, HKMP invoiced the SCBDD for "professional services" several times between April 30, 2013 and November 30, 2017.[8] (*See id.* at 46-82). But there is also evidence suggesting HKMP did not represent SCBDD as to all matters, including those involving Plaintiffs. *See* Restatement (Third) of the Law Governing Lawyers § 75 cmt. c ("[A] lawyer might also represent one co-client on other matters separate from the common one.").

Though Hurst now attests his "goal at the start of the DOL proceedings was to have Mr. Postalakis and Mr. Kessler, and their Firm, represent the SCBDD's employees," (Doc. No. 82-1 at 4), Hurst's statements at the time show his "goal" was not the reality. In an email sent on

---

[8] Though two of the invoices were sent during the relevant time period (on October 31, 2017 and November 30, 2017, respectively, (*id.* at 80, 82)), the nature of these services rendered is not provided and neither SCBDD nor Seneca Re-Ad argue these should be considered objective evidence of the attorney-client relationship. Instead, the two seemingly agree there is no objective evidence showing the existence of the alleged attorney-client relationship.

November 19, 2015, Hurst included an article from The Toledo Blade about the Department of

Labor petition and advised,

> I wanted to keep you informed of issue with Ohio Legal Rights.  The below article
> hit the paper today.  We are in the process of reviewing the facts and preparing for
> the federal investigation.  We have consulted with Frank Hickman for representation
> if needed.  Seneca [Re-Ad] will be seeking a Wage Labor Attorney to represent them
> in the federal hearing.

(Doc. No. 94-23 at 2).

Following the Department of Labor decision on February 2, 2016, Hurst sent the following,

> I am forwarding the judgement of the hearing regarding Seneca Re-[Ad].  Currently,
> Frank Hickman is reviewing and will advise us how to [proceed].
>
> In summary the Judge ordered that the individuals be paid minimum wages for the
> last three years plus liquated damages plus attorneys fees.  The approximate cost is
> $57,000 .  They will pay out of their reserves.
>
> We will need . . . to determine how to proceed with Seneca Re[-Ad].  I will be seeing
> if we can schedule Frank Hickman to attend our next board meeting.

(Doc. No. 95-25 at 25).

As I noted above, the January 2016 SCBDD Minutes show the SCBDD already agreed to "invite

[Hickman] to the February meeting to discuss the recent federal hearing."  (Doc. No. 94-24 at 4).

From this, one could reasonably conclude Hurst and the SCBDD understood Hickman, and not

HKMP, was representing the SCBDD in the Department of Labor proceedings.

Hickman apparently shared this understanding that he, and not HKMP, represented the

SCBDD on those matters involving Plaintiffs, even after the administrative proceedings.  In an

email exchange between Hickman and Plaintiffs' counsel in December 2017, Hickman

acknowledged the SCBDD was distinct from "Seneca Re-Ad or Counsel," (Doc. No. 94-6 at 2), and

stated he "agree[d] that no communication should occur between [SCBDD] staff and counsel for

Seneca Re-Ad without formal written permission or other legal process such as discovery."  (Doc.

No. 94-7 at 3).

The SCBDD and Seneca Re-Ad now allege Hickman was mistaken as to this belief, citing the January 31, 2018 Letter from HKMP to Plaintiffs' counsel. In that letter, Postalakis stated,

> We are aware that in December you received an email communication from Frank Hickman wherein he opined that counsel for Seneca Re-Ad should not communicate with County Board staff concerning your clients without written permission or by way of the discovery process. However, at the time of that communication Frank was not fully aware of the relevant facts, specifically that our firm has a long-standing attorney-client relationship with the County Board, and an appropriate business associate agreement, a copy of which is attached. We have discussed this matter with Frank and he now agrees that there is nothing inappropriate about our firm investigating your clients' requests for services and responding to your several letters about that topic. Hickman & Lowder Co. L.P.A. also represents the County Board and will continue to do so.

(Doc. No. 82-4 at 1).[9]

On February 27, 2018, Hickman seemingly acknowledged this attorney-client relationship by answering, "See privilege log," to Plaintiffs' public records request for communications between Biggert and attorneys for Seneca Re-Ad related to Plaintiffs. (Doc. No. 82-5 at 2).

Still, HKMP admits that it did not represent the SCBDD in all matters during the relevant time period. Specifically, during the contract negotiation between Seneca Re-Ad and the SCBDD, HKMP admits that it represented Seneca Re-Ad and Hickman represented the SCBDD. (Doc. No. 95 at 13). The evidence shows this negotiation occurred in or around March 2018. (Doc. No. 94-26). Because HKMP was representing Seneca Re-Ad in the course of this contract negotiation, in direct conflict with the interests of the SCBDD, I must conclude the scope of any attorney-client relationship between HKMP and the SCBDD at this time was limited.

Viewing the evidence as a whole, it appears that *an* attorney-client relationship existed between HKMP and the SCBDD during the time in question, but the scope of that relationship

---

[9] Neither the SCBDD nor Seneca Re-Ad now argue the Business Associate Agreement referred to by Postalakis should serve as objective evidence of an attorney-client relationship. Perhaps this is because the Business Associate Agreement in the record terminated on November 19, 2016. (Doc. No. 94-1 at 27).

remains murky. The conflicting evidence regarding who represented the SCBDD during the Department of Labor proceedings calls into question whether HKMP was truly representing the SCBDD in matters related to Plaintiffs.

Because it is clear that HKMP did not represent the SCBDD in all matters, I cannot conclude the emails listed on the SCBDD privilege log were "communications necessary to obtain legal advice" from the descriptions stated on the privilege log. For example, while the December 18, 2018 email from Postalakis is described as "notice of lawsuit," it is not clear whether he was notifying SCBDD of this lawsuit in his capacity as Seneca Re-Ad's attorney or the SCBDD's. (Doc. No. 94-17 at 3). Therefore, I conclude the SCBDD has failed to satisfy its burden of proof and deny the motion, accordingly.

## B.      Communications involving SCBDD, HKMP, and Seneca Re-Ad

The second group of emails at issue involve communications between three parties: SCBDD, HKMP, and Seneca Re-Ad. "The attorney-client privilege is waived by voluntary disclosure of private communications by an individual or corporation to third parties." *Dakota*, 197 F.3d at 825. An exception to this general rule is the joint-client (or co-client) doctrine, which protects privileged communications between co-clients and their common attorney from discovery by third parties. *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 362-64 (3d Cir. 2007); *Grand Trunk W. R.R. Co. v. H.W. Nelson Co.*, 116 F.2d 823, 835 (6th Cir. 1941) ("[W]hen two persons employ a lawyer as their common agent, their communications to him as to strangers will be privileged.").

The joint-client doctrine applies only when: (1) an attorney-client relationship exists between the common attorney and each alleged co-client; and (2) "the co-clients convey their desire for [joint] representation, and the lawyer consents." *In re Teleglobe*, 493 F.3d at 362; Restatement (Third) of the Law Governing Lawyers § 75 cmt. c (June 2021 update). While "[t]he scope of the co-client relationship is determined by the extent of the legal matter of common interest[,]" "clients of the

same lawyer who share *a* common interest are not necessarily co-clients."  Restatement (Third) of the Law Governing Lawyers § 75 cmt. c (emphasis added).  "[B]ecause co-clients agree to share all information related to the matter of common interest with each other and to employ the same attorney, their legal interests must be identical (or nearly so) in order that an attorney can represent them all with the candor, vigor, and loyalty that our ethics require."  *In re Teleglobe*, 493 F.3d at 366.

"Whether individuals have jointly consulted a lawyer or have merely entered concurrent but separate representations is determined by the understanding of the parties and the lawyer in light of the circumstances."  Restatement (Third) of the Law Governing Lawyers § 75 cmt. c.  "In determining whether parties are 'joint clients,' courts may consider multiple factors, including but not limited to matters such as payment arrangements, allocation of decisionmaking roles, requests for advice, attendance at meetings, frequency and content of correspondence, and the like."  *F.D.I.C. v. Ogden Corp.*, 202 F.3d 454, 462 (1st Cir. 2000) (citing cases).

Although the SCBDD and Seneca Re-Ad do not address the joint-client doctrine, they do allege they were both represented by HKMP and share a common interest in matters involving Plaintiffs.  In support, they first cite the unexecuted 2015 Joint Defense Agreement to show they shared a common interest in jointly defending against the Department of Labor petition because their "relationship is such that the [SCBDD]'s employees are involved in the business of the [Seneca Re-Ad] and have substantial knowledge regarding the facts and claims arising under the Petition." (Doc. No. 82-3 at 1).

Setting aside that no executed copy of this Agreement can be located and there is a possibility that it was never executed, (Doc. No. 82-9 at 2), the Agreement does not show the SCBDD and Seneca Re-Ad's "legal interests were identical (or nearly so)."[10]  *In re Teleglobe*, 493 F.3d

---

[10] In the Department of Labor hearing, Biggert testified SCBDD had an interest in Seneca Re-Ad paying Plaintiffs subminimum wage because doing so increased the opportunities for workers with disabilities.  (*Steward v. Seneca Re-Ad Industries Inc.*, Case No. 3:17-cv-2119, Doc. No. 1-1 at 3-4).  He

at 366. Further, the Agreement lists Hickman as part of the collective "Counsel" with HKMP, again calling into question who represented the SCBDD during the administrative proceedings. Finally, the Agreement applied only to the Department of Labor proceedings and not the civil lawsuits subsequently filed by Plaintiffs. Therefore, I conclude this Agreement does not show HKMP represented Seneca Re-Ad and SCBDD as joint clients in matters related to Plaintiffs, during or after the Department of Labor proceedings.

Seneca Re-Ad and SCBDD also contend the January 31, 2018 Letter from Postalakis to Plaintiffs' counsel shows HKMP represented both Seneca Re-Ad and SCBDD. But the existence and scope of any alleged joint-client relationship at this time are suspect, given the fact that SCBDD and Seneca Re-Ad were on opposite sides of a contract negotiation at this time, and HKMP was representing Seneca Re-Ad in those negotiations. Therefore, I conclude this letter does not show Seneca Re-Ad and SCBDD shared a desire for joint representation by HKMP at that time.

Because SCBDD and Seneca Re-Ad have not shown they shared a desire for joint representation in a legal matter for which "their legal interests [were] identical (or nearly so)," let alone that the subject emails were "communications necessary to obtain legal advice" about their common legal interest, they fail to satisfy their burden of showing the joint-client doctrine applies. Therefore, any attorney-client privilege which may otherwise shield their individual communications

---

explained that if Seneca Re-Ad was required to "pay[ ] every individual at least minimum wage, it would be hard to retain that contract [with Roppe Industries]" and would possibly result in Roppe Industries opting to

"automat[e] a large portion of what [those working at Seneca Re-Ad] do and eliminat[e] at least half of the workforce." (*Id.* at 4). This arguably falls within SCBDD's regulation-defined purpose of "ensur[ing] the safe and equitable provision of services to eligible individuals and their families." O.A.C. § 5123-4-01(A). But, because the issue was whether Seneca Re-Ad violated Plaintiffs' rights under the Fair Labor Standards Act by paying them subminimum wage, Seneca Re-Ad's interests may have conflicted with SCBDD's duty to "protect the rights of individuals." O.A.C. § 5123-4-01(A). Although HKMP admits it failed to secure the appropriate conflict waiver for its alleged dual representation during the administrative proceedings, HKMP now asserts it "did recognize conflicts between SCBDD and Seneca Re-Ad could exist." (Doc. No. 95 at 13).

with HKMP from discovery is deemed waived by voluntary disclosure of those communications to the other.  The motions for protection are denied as to those emails.

### IV.    CONCLUSION

For the foregoing reasons, the motions for protective order are denied, without prejudice.


So Ordered.

s/ Jeffrey J. Helmick
United States District Judge
